**Sandvik AKTIEBOLAG,**
**Plaintiff–Appellant,**

v.

**E.J. COMPANY, Vira Hayes and Robert Hayes, Defendants–Appellees.**

**No. 97–1168.**

United States Court of Appeals,
Federal Circuit.

Aug. 6, 1997.

Rehearing Denied; Suggestion for Rehearing In Banc Declined
Oct. 16, 1997.

·Ronald L. Grudziecki, Burns, Doane, Swecker & Mathis, LLP, Alexandria, VA, argued for plaintiff–appellant. With him on the brief was Allan Madis Soobert. Of counsel was I.C. Waddey, Jr., Waddey & Patterson, Nashville, TN.

Robert E. Pitts, Pitts & Brittian, P.C., Knoxville, TN, argued for defendants–appellees. With him on brief were R. Bradford Brittian, Melinda L. Doss, and Raymond E. Stephens. Of counsel on brief was Hal D. Hardin, Nashville, TN.

Before ARCHER, Chief Judge, MICHEL, and LOURIE, Circuit Judges.

ARCHER, Chief Judge.

Sandvik Aktiebolag (Sandvik) appeals the order of the United States District Court for the Middle District of Tennessee, No. 3–94–1076, granting summary judgment of noninfringement in favor of defendant E.J. Company (E.J.). The district court held that United States Patent No. 4,222,690 (the '690 patent) and United States Patent No. 4,381,-162 (the '162 patent) were not infringed because defendant's replacement of the carbide tip of the drill constituted a permissible repair. We reverse.

## BACKGROUND

The facts in this case are not in dispute. The patents in suit are directed to a drill with a shank portion and a unique carbide tip geometry that has specially configured cutting edges resulting in a drill suitable for high-feed machining with improved cutting ability especially at its center portion.[1] The drill tip is not separately patented.

---

1. Claim 1 of the '690 patent provides:

A drill comprising a pair of cutting edges each starting at the center of rotation of the drill and extending symmetrically with respect to said center and curved outwardly away from the direction of rotation of the drill with a greater curvature in the radial inner portion than in the outer peripheral portion of the drill when viewed from the bottom of the drill, each of the cutting edges being formed with a rake face starting at said center of rotation and having a rake angle approximately equal to zero at the radial inner portion of said rake face, said drill having twisted grooves, and means defining a cavity formed in said twisted grooves close to said starting end of each of the cutting edges to provide an increase in rake face at the inner radial portion of the cutting edge in the vicinity of said starting end of said cutting edge.

The '162 patent, a division of the '690 patent, describes and claims similar subject matter. For example, claim 1 of the '162 patent claims a method of drilling a bore using a drill having "helical grooves and a pair of cutting edges having a rake face."

As illustrated in the above drawings from the '690 patent, the drill has a tip (1), shank portion (2), twisted grooves (3), projections (4) (these projections bend and break the chips to render them smoothly removable) and a conical end having a center point (11) at the apex of the cone and a pair of cutting edges (10). The drill shank (2) is made of medium carbon steel. The drill tip (1) is made of a more durable carbide and is brazed to the steel shank (2). Brazing is like soldering but with a much higher melting point. It requires a temperature of 1300 degrees Fahrenheit to join the carbide tip to the steel shank.

Sandvik manufactures a commercial embodiment of the patented drill. Although made of durable carbide, over time and use, the drill tip dulls and may require resharpening. Resharpening, also known as regrinding, involves putting a new edge on the drill tip. Normally, the drill can cut through about one thousand inches of material before needing resharpening, depending, of course, upon the hardness of the material being cut. Sandvik expects the drill tip to be resharpened and, in fact, issues guidelines explaining how to resharpen the tip so as to maintain the specially configured cutting edges. Sandvik does not contend that resharpening constitutes infringement.

E.J. offers a drill repair service which includes resharpening and retipping Sandvik drills. E.J. retips, at the request of its customers, when the tip cannot be sharpened because it chips, cracks or simply wears down after being resharpened several times. According to E.J.'s vice-president, Mr. Robert Hayes, some of E.J.'s customers elect not to have the drill retipped when it cannot be resharpened any longer. E.J. returns the drill to the customer or disposes of it at the customer's request. The parties agree that when the tip is damaged (i.e. chipped, cracked or sufficiently worn down so that it cannot be resharpened), the drill has reached the end of its useful life unless it is retipped.

E.J.'s retipping process includes removing the worn or damaged tip by heating the tip to 1300 degrees Fahrenheit using an acetylene torch. E.J. then brazes in a rectangular piece of new carbide onto the drill shank. After the piece of carbide has cooled, E.J.

recreates the patented geometry of the cutting edges by machining the carbide. This process includes: (1) grinding the carbide to the proper outside diameter; (2) grinding the carbide to a point; (3) grinding the rake surfaces of the new point; (4) grinding the center of the new point; and (5) honing the edges. In the final steps of the machining process, E.J. creates the cutting edges by following Sandvik's instructions for tip resharpening.

Sandvik claims that E.J.'s retipping service constitutes an infringing reconstruction of its patented drills. Sandvik does not manufacture or sell replacement drill tips. It contends that it never intended for the drills to be retipped. E.J. contends that its retipping service is a lawful repair of the patented drills.

On December 7, 1994, Sandvik filed a patent infringement suit in the United States District Court for the Middle District of Tennessee claiming that E.J.'s retipping service was an impermissible reconstruction of the patented drill and that E.J.'s actions, therefore, constituted an infringement of the '690 and '162 patents. On summary judgment, the district court held that E.J.'s retipping was a permissible repair, not a reconstruction of the drills.

## DISCUSSION

### I.

We review the district court's grant of summary judgment *de novo, Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994), with all justifiable factual inferences being drawn in favor of the party opposing summary judgment, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Whether defendant's actions constitute a permissible repair or an infringing reconstruction is a question of law which we also review *de novo. Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 217, 100 S.Ct. 2601, 2623–24, 65 L.Ed.2d 696 (1980) (holding that whether defendant's action constitutes a repair or a reconstruction

is a "legal distinction"); *Sage Prods., Inc. v. Devon Indus., Inc.,* 45 F.3d 1575, 1577, 33 USPQ2d 1765, 1766–67 (Fed.Cir.1995) (whether defendant's actions were a permissible repair or an infringing reconstruction is a question of law); *FMC Corp. v. Up–Right, Inc.,* 21 F.3d 1073, 1078, 30 USPQ2d 1361, 1364 (Fed.Cir.1994) (the distinction between repair and reconstruction is a "legal standard").

### II.

Direct infringement includes the making of a patented article without authority. 35 U.S.C. § 271(a) (1994). Sandvik contends that E.J. is reconstructing its patented drill and therefore infringing its '690 and '162 patents under § 271(a). However, when Sandvik sold its patented drills to its customers, it granted them an implied license to use the drill for its useful life, *see Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 484, 84 S.Ct. 1526, 1531, 12 L.Ed.2d 457 (1964) (*"Aro II"*), and the implied license to use includes the right to repair the patented drill, *see, e.g., Standard Havens Prods., Inc. v. Gencor Indus., Inc.,* 953 F.2d 1360, 1376, 21 USPQ2d 1321, 1333 (Fed.Cir.1991).

The Supreme Court has taken an expansive view of what constitutes a permissible repair. In *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (*"Aro I"*), the Court held that the replacement of the fabric portion of a convertible car top was a permissible repair, not an infringing reconstruction. 365 U.S. at 346, 81 S.Ct. at 604–05. The Court held: "No element, not itself separately patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination and no matter how costly or difficult replacement may be." *Id.* at 345, 81 S.Ct. at 604. Therefore, even if E.J.'s retipping service cost almost as much as the drill or if the replacement of the tip is difficult and time consuming, as in this case, these factors are not dispositive of reconstruction.

The Court also rejected the "heart of the invention test." *See id.* at 344–45, 81 S.Ct. at

603–04 (holding that replacement of the distinguishing part of the patented combination does not amount to a reconstruction because a patent covers the totality of the elements in a combination); *see also Dawson Chem.*, 448 U.S. at 217, 100 S.Ct. at 2623–24 (This Court has "eschewed the suggestion that the legal distinction between 'reconstruction' and 'repair' should be affected by whether the element of the combination that has been replaced is an 'essential' or 'distinguishing' part of the invention.") (citing *Aro I*, 365 U.S. at 344, 81 S.Ct. at 603–04); *Sage Prods.*, 45 F.3d at 1577, 33 USPQ2d at 1767 ("The size or relative importance of the replacement part to the patented combination is not relevant when determining whether conduct constitutes repair or replacement."). Therefore, the fact that E.J. may be replacing the novel features of the '690 patented invention is also not dispositive of reconstruction.

In *Aro I*, the Supreme Court further explained the test for what constitutes a reconstruction: "The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to 'in fact make a new article,' after the entity, viewed as a whole, has become spent." 365 U.S. at 346, 81 S.Ct. at 604 (citations omitted). Although we question the district court's finding that the tip is, in fact, a separate part of the device, we need not reach this issue because the court nevertheless failed to analyze whether the replacement of this "part" constituted reconstruction consistent with *Aro I*.

■ There are a number of factors to consider in determining whether a defendant has made a new article, after the device has become spent, including the nature of the actions by the defendant, the nature of the device and how it is designed (namely, whether one of the components of the patented combination has a shorter useful life than the whole), whether a market has developed to manufacture or service the part at issue and objective evidence of the intent of the patentee. Under the totality of the circumstances, we hold in this case that E.J.'s actions are a reconstruction.

By E.J.'s own admission, the drill is "spent" when the tip can no longer be resharpened unless it is retipped. In fact, the record reveals that E.J.'s customers may elect not to retip and inform E.J. to discard the drill instead.

Moreover, the nature of the work done by E.J. shows that retipping is more like reconstruction than repair. E.J. does not just attach a new part for a worn part, but rather must go .though several steps to replace, configure and integrate the tip onto the shank. It has to break the worn or damaged tip from the shank by heating it to 1300 degrees Fahrenheit. It brazes to the shank a new rectangular block of carbide and grinds and machines it to the proper diameter and creates the point. Thereafter, the tip is honed and sharpened, grinding the rake surfaces and the center of the point and honing the edges. These actions are effectively a re-creation of the patented invention after it is spent.

This is not a case where it is clear that the patented device has a useful life much longer than that of certain parts which wear out quickly. For example, in *Wilson v. Simpson*, 50 U.S. (9 How.) 109, 125–26, 13 L.Ed. 66 (1850), in determining that a repair had occurred, the Supreme Court focused specifically on the fact that the machine was designed so that the knives had to be replaced long before the other components: .

> The proof in the case, is, that one of [the patentee's] machines, properly made, will last in use for several years, but that its cutting-knives will wear out and must be replaced at least every sixty or ninety days.
>
> . . .
>
> [If such a] part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain.

50 U.S. (9 How.) at 125–26, 13 L.Ed. 66. *See also Aro I*, 365 U.S. at 337–38, 81 S.Ct. at 600 (noting that the fabric had a much shorter expected life (about three years) than the convertible car top); *Porter v. Farmer Supply Serv., Inc.*, 790 F.2d 882, 883, 229 USPQ

814, 814 (Fed.Cir.1986) ("The useful life of a disk is measured in weeks, that of a harvester is five or six years. The district court found, and it is undisputed, that a purchaser can expect to wear out many disks during the useful life of the header.").

The drill tip in this case is not a part like the detachable knives in the *Wilson* that have to be replaced periodically over the useful life of the planing machine. The drill tip was not manufactured to be a replaceable part, although it could be resharpened a number of times to extend its life. It was not intended or expected to have a life of temporary duration in comparison to the drill shank. And finally, the tip was not attached to the shank in a manner to be easily detachable.

In *Aro I*, the Supreme Court also noted that "the consequent demand for replacement fabrics has given rise to a substantial industry." Evidence of development in the industry could also be a factor tending to prove that there is a reasonable expectation that the part of the patented combination wears out quickly and requires frequent replacement. *See also Kendall Co. v. Progressive Medical Tech., Inc.*, 85 F.3d 1570, 1572, 38 USPQ2d 1917, 1919 (Fed.Cir.1996) ("The resulting market for replacement sleeves has been substantial."); *Sage Prods.*, 45 F.3d at 1577, 33 USPQ2d at 1766 (noting that "[t]he sale of ·replacement inner containers is a sizable market."). In this case, there is no evidence of a substantial market for drill retipping of the sort required for the Sandvik drill. There is no evidence of large numbers of customers retipping these drills or of companies (other than E.J.) offering to retip these drills. No one manufactures replacement tips for Sandvik's drill and although some customers opt to retip the drill only a small percentage of all drills manufactured are retipped.

Finally, there was no intent evidenced by the patentee that would support E.J.'s argument that replacement of the tips is a repair. *See Kendall Co.*, 85 F.3d at 1575, 38 USPQ2d at 1921 (replacing the sleeve in a medical device which applies pressure to patients' limbs was a repair noting that the manufacturer "clearly intended to permit its custom-ers to replace the sleeves" and actually sold replacement sleeves); *Sage Prods.*, 45 F.3d at 1578–79, 33 USPQ2d at 1767–68 (evidence that patentee intended the inner containers to be replaced, that it manufactures replacement parts and instructs customers to replace supports holding such replacement a permissible repair); *Porter*, 790 F.2d at 885–86, 229 USPQ at 816–17 (considering that the patentee sold replacement cutting disks for its tomato harvester). The evidence shows that Sandvik never intended for its drills to be retipped. It did not manufacture or sell replacement drill tips. It did not publish instructions on how to retip its patented drills or suggest that the drills could or should be retipped. Sandvik was aware that the drill tip would need occasional resharpening and instructed its customer on how to resharpen the tip. There is, therefore, no objective evidence that Sandvik's drill tip was intended to be a replaceable part. Although the repair or reconstruction issue does not turn on the intention of the patentee alone, the fact that no replacement drill tips have ever been made or sold by the patentee is consistent with the conclusion that replacement of the carbide tip is not a permissible repair.

Although there is no bright-line test for determining whether reconstruction or repair has occurred, we conclude based on all of the facts in this case that E.J. is reconstructing an otherwise spent device when it retips Sandvik's drills. Accordingly, we hold that E.J.'s drill tip replacements infringe the '690 and '162 patents. Because there are no disputed issues of fact, we reverse the district court grant of summary judgment.

*REVERSED.*