PHILLIPS PETROLEUM COMPANY,
Plaintiff–Appellant,

v.

HUNTSMAN POLYMERS
CORPORATION, Defendant–Appellee,

and

Aristech Chemical Corporation,
Defendant–Appellee.

No. 97–1218.

United States Court of Appeals,
Federal Circuit.

Sept. 22, 1998.

Harry J. Roper, Roper & Quigg, Chicago, IL, argued for plaintiff-appellant. Of counsel on the brief were George S. Bosy and Frank J. Nuzzi. Also of counsel on the brief was Lyell H. Carver, Bartlesville, OK.

James Galbraith, Kenyon & Kenyon, New York City, argued for defendant-appellee, Aristech Chemical Corporation.

Stanton T. Lawrence, III, Pennie & Edmonds LLP, Washington, DC, argued for defendent-appellee, Huntsman Polymers Corporation. With him on the brief was Paul J. Zegger.

Before RICH, NEWMAN, and SCHALL, Circuit Judges.

Opinion for the court filed PER CURIAM. Concurring opinion filed by Circuit Judge NEWMAN.

PER CURIAM.

This appeal is from a final judgment of the United States District Court for the Southern District of Texas in a patent infringement suit, *Phillips Petroleum Co. v. El Paso Prods. Co.*, No. H–86–3241 (S.D.Tex. Dec. 23, 1996). Phillips Petroleum Company (Phillips) is the assignee of U.S. Pat. Nos. 3,970,-719 ('719 patent) and 4,039,632 ('632 patent), relating to novel block copolymer compositions and a method for preparing the compositions. Huntsman Polymers Corporation (Huntsman) and Aristech Chemical Corporation (Aristech) produce competing polymer products.[1] Phillips sued Huntsman and Aristech for infringement of the '719 and '632 patents. After receiving recommendations from a Special Master, the district court adopted the findings of the Special Master, denied Phillips' motion for partial summary judgment of infringement, and granted Aristech's and Huntsman's motion for summary judgment of noninfringement. On appeal, Phillips challenges the district court's claim construction and its rulings on literal in-

---

1. During proceedings in the district court, Huntsman was first known as El Paso Products Co. *See Phillips Petroleum Co. v. El Paso Prods. Co.*, No. H–86–3241, slip op. at 1 n. 1 (S.D.Tex. Nov. 19, 1996). It changed its name to Rexene Products Company, and then to Rexene Corporation, before assuming its present name, which we use in this opinion.

fringement and infringement under the doctrine of equivalents. We affirm.

## BACKGROUND

### I.

Only claims 1 and 2 of the '719 patent are at issue on appeal. The '719 patent application was filed on January 16, 1958 by inventor James T. Edmonds, Jr. (Edmonds). The patent issued on July 20, 1976 and is entitled "Preparation of Block Copolymers."

The '719 patent is generally directed to "block copolymers" and methods related to the production thereof. "Block copolymers" are a type of polymer. Polymer blocks are formed from polymer molecules, which are formed by chemically linking or bonding together smaller molecules, called monomers, to form chain-like molecules. Depending on the nature of the monomers, the polymer may be characterized as a homopolymer or a copolymer. When the monomers are of a single chemical species, the polymer is termed a homopolymer;[2] when the monomers are of varied chemical species, the polymer is termed a copolymer.[3] A "block copolymer" is a polymer typically comprised of linked blocks of homopolymers, copolymers, or a mixture thereof.[4]

Polymers may exist in several forms, including straight chains, blends, and grafts. In a straight chain, the polymer blocks are bonded end to end. In a blend, the polymer blocks are physically combined rather than chemically bonded. In a graft copolymer, various polymer blocks are attached to form a branched polymer.[5]

Block copolymers often exhibit physical properties distinct from those of the individual monomer or copolymer blocks of which they are composed. The block copolymers claimed in the '719 patent are characterized by excellent tensile and impact strength relative to other polymers composed of the same monomers. *See* '719 patent, col. 4, ll. 19–26. This renders them particularly useful in applications that require solid plastics with these characteristics, i.e., bottles and various pipes and tubes. *See id.* at col. 9, ll. 36–41.

The parties stipulated that claims 1 and 2 of the '719 patent were representative of the infringement issues. *See Phillips Petroleum Co. v. Rexene Prods. Co.*, No. H–87–3445, slip op. at 3 (Recommendations of the Special Master Sept. 30, 1991) (hereinafter *"Recommendations"*). Claims 1 and 2 of the '719 patent read:

> A block copolymer comprising a first polymer block of a homopolymer of propylene and ajacent [sic] thereto a second polymer block of a copolymer of ethylene and propylene.

> A process of preparing block copolymers from ethylene and propylene monomers,

---

**2.** For example, linking monomers of composition "A" together would result in the formation of a homopolymer of the form "–A–A–A–A–."

**3.** For example, a random copolymer, comprised of monomers "A" and "B," would contain a statistically random distribution of those monomers in a form such as "–A–B–B–A–B–A–B–A–A–." The order of the monomers is random rather than having a predictable order.

**4.** For example, a block copolymer having a homopolymer block of monomer "A" linked to a homopolymer block of monomer "B" may take the form "–A–A–A–A–B–B–B–B–." A block copolymer having a homopolymer block of monomer "A" linked to a random copolymer block of monomers "B" and "C" may have the form "–A–A–A–A–B–B–C–B–C–C–C–B–B–."

**5.** For example, a graft copolymer having homopolymer blocks of monomer "A" and monomer "B" may take the form

which comprises alternately polymerizing one of said monomers and a mixture of said monomers in the presence of a catalyst comprising a titanium halide and an aluminum alkyl compound.

The claimed invention is directed to a straight chain polymer, "wherein alpha-olefins and/or mixtures of alpha-olefins are alternately polymerized in the presence of a catalyst of titanium halide and an aluminum alkyl compound." [6] '719 patent, Abstract.

The polymerization process frequently requires a catalyst.[7] Catalysts provide an "active site," allowing polymer chains to grow by a process called "insertion." Insertion refers to the addition of a monomer or copolymer unit into the polymer chain. Polymer chains attached to an active site are referred to as "live" polymer chains. Polymer chains which are no longer attached to an active site are referred to as "dead" polymer chains because they are no longer capable of growth.

The '719 patent describes a multi-step polymerization process for linking one alpha-olefin block to a second alpha-olefin block through a series of reactions. See id. at col. 1, ll. 37–49. The result is a final polymeric product "made up of blocks or segments, each of which is substantially a homopolymer of one of the olefins employed in the process." Id. at col. 1, ll. 33–35. The flexible nature of the process allows for "block copolymers formed of homopolymers of two different aliphatic 1–olefins as well as a block copolymer in which the individual polymer blocks are homopolymers and copolymers or copolymers only." Id. at col. 1, ll. 51–54.[8] The resulting block copolymers have the de-

sired characteristics, i.e., the appropriate tensile and impact strength.

The alleged infringers, Aristech and Huntsman, both operate manufacturing plants that produce impact grade polypropylene products using multi-step polymerization processes. See Recommendations at 6. In the first step, propylene is polymerized in the presence of a catalyst and hydrogen in a "homopolymer reactor" to produce a homopolymer, polypropylene. See id. Hydrogen is used to terminate chain growth. See id. The dead homopolymer propylene chains then are transferred to a "copolymer reactor," where a mixture of ethylene and propylene is polymerized in the presence of a catalyst to form random copolymers. See id. This process yields a mixture of polypropylene homopolymer molecules and random ethylene and propylene copolymer molecules.

## II.

On March 8, 1984, Phillips filed suit against Huntsman in the United States District Court for the Northern District of Illinois, alleging inter alia willful infringement of the '719 patent. Subsequently, on November 4, 1987, Phillips filed suit against Aristech in the United States District Court for the Southern District of Texas, making the same allegations. Both defendants answered the complaints and raised affirmative defenses, and Huntsman counterclaimed, asserting inter alia that it had not infringed the '719 patent and that the patent was invalid and unenforceable.[9] On May 5, 1987, Phillips' action against Huntsman was consolidated with its pending suit against Shell Oil Company in the Southern District of Texas, pur-

6. An alpha-olefin, also known as an aliphatic 1–olefin, is an open-chain hydrocarbon, containing a single terminal double bond between two carbon atoms. Examples of the alpha-olefins used in the preparation of the disclosed block copolymers include ethylene, propylene, 1–butene, 1–pentene, 1–hexene, and 1–octene. See '719 patent, col. 3, ll. 5–6.

7. Chemical catalysis is a complex process, which is not completely understood for all polymerization processes. Catalysis is discussed in this opinion only to the extent necessary to understand the processes at issue.

8. A block copolymer of a homopolymer of an alpha-olefin and a copolymer of alpha-olefins is produced by charging a mixture of alpha-olefins into the reaction chamber after a homopolymer block has been formed during a first charge to the reaction chamber. See '719 patent, col. 3, ll. 50–62. Block copolymers consisting of copolymer blocks are formed by introducing mixtures of alpha-olefins during both the first and second charges to the reaction chamber. See id. at col. 3, ll. 62–64.

9. Huntsman withdrew its counterclaim without prejudice on December 5, 1996.

suant to Fed.R.Civ.P. 42(a).[10] On March 14, 1988, Phillips' action against Aristech was consolidated with its suit against Huntsman.

On May 1, 1990, Aristech moved for summary judgment of noninfringement. Two weeks later, Huntsman moved for leave to join the motion, which was granted. On January 1, 1991, Phillips moved for partial summary judgment that Huntsman and Aristech infringed claim 2 of the '719 patent, both literally and under the doctrine of equivalents. On February 8, 1991, the parties stipulated to the appointment of a Special Master, pursuant to Fed.R.Civ.P. 53.

On October 2, 1991, the Special Master filed his recommendations with the district court. He recommended that Phillips' motion for partial summary judgment of infringement be denied and that Huntsman's and Aristech's motion for summary judgment of noninfringement be granted. *See Recommendations* at 6. The district court adopted the Special Master's recommendations, denied Phillips' motion for partial summary judgment, and granted Aristech's and Huntsman's motion for summary judgment of noninfringement. *See Phillips,* No. H–86–3241, slip op. at 2 (Nov. 19, 1996). The district court entered final judgment on December 23, 1996. *See Phillips,* No. H–86–3241 (Dec. 23, 1996). This appeal followed.

## DISCUSSION

### I.

Summary judgment is proper in a case where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c) (1998). We review the district court's grant of summary judgment *de novo. See Aktiebolag v. E.J. Co.,* 121 F.3d 669, 672, 43 U.S.P.Q.2d 1620, 1622 (Fed.Cir.1997) (citing *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 U.S.P.Q.2d 1373, 1377 (Fed. Cir.1994)). In reviewing a summary judgment decision, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the movant has the burden of establishing that there are no genuine issues of material fact, the party opposing summary judgment "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." *Id.* at 256, 106 S.Ct. 2505.

A patent infringement analysis entails two steps. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1576, 27 U.S.P.Q.2d 1836, 1839 (Fed.Cir. 1993); *see Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 34 U.S.P.Q.2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996). Claim construction is purely a question of law, which we review *de novo. See Markman,* 52 F.3d at 979, 34 U.S.P.Q.2d at 1329; *Cybor Corp. v. FAS Technologies, Inc.,* 138 F.3d 1448, 1455, 46 U.S.P.Q.2d 1169, 1173 (Fed.Cir.1998) (in banc) (reiterating that "the totality of claim construction is a legal question to be decided by the judge" and "that the *de novo* standard of review as stated in [this court's in banc *Markman* opinion] remains good law").

In interpreting the claims of a patent, the court first looks to the intrinsic evidence of record, including the claims of the patent, the written description, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 U.S.P.Q.2d 1573, 1576 (Fed.Cir.1996). When the intrinsic evidence unambiguously delineates the scope of the patent, resort to extrinsic evidence, including expert testimony, is unnecessary. *See id.* at 1583, 90 F.3d 1576, 39 U.S.P.Q.2d at 1577.

### II.

The claim construction dispute in this case centers on the interpretation of the term "block copolymer" as used in claims 1 and 2 of the '719 patent. Phillips argues that the

---

**10.** The action by Phillips against Shell Oil Company was settled and dismissed with prejudice on May 21, 1987. That action does not affect this appeal.

term "block copolymer" encompasses compositions that contain "a relatively small proportion of block copolymer molecules." Huntsman and Aristech maintain that the term is only intended to refer to compositions in which the presence of block copolymer molecules is not insignificant. For purposes of the motion for summary judgment of noninfringement, Huntsman stipulated that its product contained a maximum of 25 ppm block copolymer molecules, making 99.9975% of its product other polymer substances, while Aristech stipulated that its product contained a maximum of 60 ppm block copolymer molecules, making 99.994% of its product other polymer substances. *See Recommendations* at 13.

Based on our review of the claims, the written description and the prosecution history, we conclude that Edmonds used the term "block copolymer" to refer to an overall polymeric product, i.e., the composition of claim 1 and the product of the process of claim 2. We read Edmonds' statements during prosecution as requiring that the polymeric product contain a sufficient amount of block copolymer molecules such that the polymeric product may be properly classified as a "block copolymer." We conclude that the claims require the block copolymer molecules to contain at least two polymeric blocks that form a not insignificant and identifiable portion of the molecules. We also conclude that the use of the term "block copolymer" precludes the product or composition from being a blend or a graft copolymer.[11]

### A.

■ Claim construction begins, as it must, with the words of the claims. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620, 34 U.S.P.Q.2d 1816, 1819 (Fed.Cir.1995). Generally, we give a technical term its ordinary meaning, that meaning it would be given by persons skilled in the art, unless "it is appar-

ent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578, 38 U.S.P.Q.2d 1126, 1129 (Fed.Cir.1996); *see Vitronics*, 90 F.3d at 1582, 39 U.S.P.Q.2d at 1576–77.

■ Phillips contends that the plain meaning of the term "block copolymer" was well known to those skilled in the art when Edmonds filed his patent application in 1958. We disagree. An affidavit from Dr. Quirk, one of Phillips' experts, states that the precise makeup of block copolymer products has been disputed over the last thirty years and that "[s]ome persons apparently believed these products contained predominantly block copolymer molecules ... [while] others apparently believed that these products contained small amounts of block copolymer molecules." Given that the ordinary meaning of the term "block copolymer" was disputed by those skilled in the art at the time the application was filed, we turn to the written description and prosecution history for clarification as to the patentee's intended meaning.

### B.

The written description suggests that the claimed composition and the product of the claimed process are made of blocks or segments. It provides:

> The polymers prepared by the instant process are to be distinguished from copolymers in that the final polymer product is made up of blocks or segments, each of which is substantially a homopolymer of one of the olefins employed in the process. The product of this invention can also be formed of blocks of copolymers and homopolymers as well as blocks of copolymers only.

'719 patent, col. 1, ll. 30–37. The written description refers to "the product which is

---

11. During prosecution Edmonds used the term "blend" to refer to a mixture of homopolymers and copolymers that were not chemically bonded together. Such a mixture lacks an appreciable quantity of block copolymer molecules. We recognize that Edmonds' composition and the product of his process are "blends" in that they contain block copolymer molecules physically mixed with, but not chemically bonded to, homopolymers and copolymers. We use "blend," as Edmonds did, to refer to a mixture of homopolymers and copolymers that lacks an appreciable quantity of block copolymer molecules.

produced" by the claimed process as a "block copolymer," and refers to the products produced in Examples I and III as block copolymers. *Id.* at col. 3, ll. 60–62; *see id.* at col. 4, ll. 3–10. Thus, the written description suggests that the term "block copolymer" was used by the inventor to refer to the claimed composition and the product of the claimed process and that these products were made of blocks or segments adjacent to each other. However, the written description does not further define "block copolymer" or specify what is necessary for a composition or a product to qualify as a "block copolymer" as the term is used in claims 1 and 2. We turn next to the prosecution history.

### C.

■ Phillips argues that the district court erred by using the prosecution history of the interference proceedings to interpret the claims.[12] However, because the interference proceedings are part of the public record and shed light on the meaning of the claims, it is proper to rely on the record of those proceedings in construing the claims. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.,* 93 F.3d 1572, 1579–81, 40 U.S.P.Q.2d 1019, 1024–26 (Fed.Cir.1996) (using the arguments made in support of a

12. The prosecution history of the '719 patent is extensive, including two interference proceedings. In July of 1962, Interference No. 92,869 ('869 interference) was declared, involving the claim that ultimately became claim 4 of the '719 patent. In August of 1963, Interference No. 93,-747 ('747 interference) was declared, involving the claim that ultimately became claim 2 of the '719 patent. In June of 1972, Edmonds prevailed in both interferences.

13. *See also Vitronics,* 90 F.3d at 1582–83, 39 U.S.P.Q.2d at 1577 (the prosecution history may be used to interpret claims because it "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims"); *Young Dental Mfg. Co., Inc. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1143, 42 U.S.P.Q.2d 1589, 1594 (Fed. Cir.1997) (using arguments made in a request for a declaration of interference during claim construction).

14. The first instance was in connection with a May 28, 1964 motion in the '869 interference. In a May 18, 1966 response to Edmonds' request for reconsideration of rulings on motions in the '869 interference, the Examiner stated:

request for a declaration of interference as part of the prosecution history used to construe a claim term).[13]

### 1.

■ The term "block copolymer" only appears in the preamble of the claims. However, a term appearing in the preamble is limiting when, as here, it is found to be required to confer meaning on the claim. *See In re Paulsen,* 30 F.3d 1475, 1479, 31 U.S.P.Q.2d 1671, 1673 (Fed.Cir.1994) ("[T]erms appearing in a preamble may be deemed limitations of a claim when they give meaning to the claim and properly define the invention." (internal quotations omitted)).

As originally filed, Edmonds' application did not contain the term "block copolymer(s)," but instead used the term "block polymer(s)." In an amendment, dated March 15, 1960, Edmonds replaced the term "block polymer(s)," in the claims and written description, with "block copolymer(s)." Subsequently, on two separate occasions during the course of the two interference proceedings, Edmonds attempted to delete the word "block" from the claim, explaining in one instance that the term was an "unnecessary feature in defining the process invention."[14]

The Examiner has ... concluded, in reasoning with which the party Edmonds finds no fault, that the limitation "block copolymers" is of patentable significance in the preamble of the count and that the term "block copolymers" gives life and substance to the claim in that it imports into the claim those necessary conditions for obtaining block copolymers rather than other products. The Examiner states ... that all of the parties ... have as their very objective the obtaining of block copolymers in distinction to grafts, blends, etc....

*The statement of the intended product is recognized as an essential part of this invention and unless the application teaches what steps and conditions are to be followed in order to obtain this product (block copolymer) as contrasted to other types of copolymers, the application does not disclose the invention.*

... The very reason for considering the term "block copolymers" in the claim to be a material limitation is that the linking of the result with the procedure by which this result can be obtained is crucial to the invention.

In a December 2, 1966 decision on a request for reconsideration of prior motion rulings in the '869 interference, the Examiner again stated that "[e]limination of the concept of 'block copo-

On both occasions the Examiner disagreed. In one proceeding, the Examiner indicated that "the term 'block copolymers' gives life and substance to the claim in that it imports into the claim those necessary conditions for obtaining block copolymers rather than other products." In a second proceeding, the Examiner rejected the elimination of the term because the formation of a "block copolymer" was the "heart of the invention." [15] Finally, again in the course of the '869 interference, the Examiner summarized his position as follows:

> [The use of the term "block copolymer"] *is recognized as an essential part of this invention and unless the application teaches what steps and conditions are to be followed in order to obtain this product (block copolymer) as contrasted to other types of copolymers, the application does not disclose the invention.*

(Emphasis in original). The Examiner also noted that "block copolymer" was necessary to point out that block copolymers were produced "to the exclusion of other products." The patentee acquiesced to the Examiner's logic.

## 2.

Having determined that the term "block copolymer," as used in the preambles, is a meaningful limitation to the claims, we are left to determine what the patentee intended by the term. After reviewing the prosecution history, we conclude that the patentee intended the term "block copolymer" to require (1) that the composition contain a threshold amount of block copolymer molecules with adjacent polymer blocks; and (2) that the polymer blocks comprise a significant portion of the molecules that make up the "block copolymer."

The prosecution history is replete with statements that lead us to the conclusion that "block copolymer," as used by the patentee, requires that the composition be made of block copolymer molecules that contain adjacent polymer blocks. By way of example, in 1969, in an appeal brief before the Board contesting the denial of the declaration of a third interference, Edmonds stated that his invention was "a block copolymer in which the molecules consist of two adjacent polymeric blocks." In April, 1974, in an appeal brief before the Board contesting the final rejection of the claim that would become claim 1 of the '719 patent, Edmonds stated that "[t]he invention is a block copolymer in which the molecules are made up of at least two adjacent polymeric blocks." In the same brief, Edmonds also stated that he "was the first to make a polymer which has segments of polypropylene and ethylene-propylene copolymer in the polymer molecules." Additionally, in the Patent Owner's Statement during the reexamination proceedings, Edmonds stated that the claims were directed to "a block copolymer comprising block copolymer molecules."

Finally, in a 1974 appeal, the Board reversed the Examiner's rejection of the claim that would become claim 1 of the '719 patent, stating:

> The basis of the Examiner's rejection is that it is not clear from the claim how many blocks would be required to achieve the desirable properties recited in the specification. However, the claim encompasses any block copolymer containing at least one propylene homopolymer block and at least one adjacent ethylene-propylene copolymer block, without limitation as to its physical properties.

In light of the Examiner's rejection, we read the Board's statement as addressing the number of polymer blocks required in a given block copolymer molecule. We do not construe this statement as inconsistent with the remainder of the prosecution history requiring the polymer blocks to be a significant portion of the block copolymer molecules. We read the Board's ruling as simply not requiring the block copolymer molecules of

lymer' from the count would eliminate the basic concept of the invention."

**15.** This was on February 10, 1966, in connection with the '747 interference. Thus, despite attempts to eliminate references to "block copo-

lymer" in both interferences, the term was maintained because it was what made the counts patentable, because it was "the whole inventive concept of the" interference counts, and because it was the "heart of the invention."

the claimed block copolymer composition to contain more than two adjacent polymer blocks.

### 3.

Phillips asserts that claim 1, which uses the open term "comprising," encompasses compositions that contain molecules other than block copolymer molecules. As far as claim 2 is concerned, it argues that the term "block copolymer" is not limited to block copolymer molecules, but includes the entire polymer product made by the recited polymerization process, regardless of the block copolymer molecule content. Phillips contends that the district court[16] misconstrued the claims of the '719 patent by limiting the term "block copolymer" to block copolymer molecules and by focusing on the individual molecules rather than the entire composition of claim 1 and the entire product of the process of claim 2.

However, the prosecution history supports a conclusion that polymer blocks must be a significant portion of the molecules that make up the "block copolymer." The use of "comprising" and "which comprises" in the composition and process claims generally would mean that the claims require the presence of a sufficient quantity of block copolymer molecules, but that additional elements or process steps may be present. *See Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501, 42 U.S.P.Q.2d 1608, 1611–13 (Fed.Cir. 1997) ("comprising" allows the addition of other elements so long as the named elements, which are essential, are included); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271, 229 U.S.P.Q. 805, 812 (Fed. Cir.1986) ("comprising" opens a method claim to the inclusion of additional steps, but does not affect the scope of the structure recited within the steps).

The patentee indicated a clear intent to limit the term "block copolymer." In an amendment dated October 2, 1973, Edmonds stated:

These composition claims define the invention as a "block copolymer" having defined first and second polymer blocks. *The specification clearly teaches that these polymer blocks are each a significant portion of the entire macromolecule and the claims could not be reasonably interpreted to read on polymers in which the macromolecules contained an insignificant number of serially lined monomer units.* Without question each block would have to be identifiable as a segment of the polymer and be of some consequence in determining the properties of the polymer.

(emphasis added). Edmonds reiterated this contention in his 1974 appeal brief before the Board.[17]

Moreover, the prosecution history is buttressed by technical articles, presented to the PTO during the course of prosecution. In a 1974 reply brief before the Board contesting the rejection under 35 U.S.C. § 112, para. 2, of the claim that would become claim 1 of the '719 patent, Edmonds stated:

[T]he prosecution record of this case clearly shows that block copolymers broadly were well known before applicant's invention. The meaning of the term "block" is not different in the present invention from its commonly understood meaning in the polymer art. This terminology was well developed in 1958 when the subject application was filed.

[T]he record of prosecution of this application contains adequate authority for the appellant's proposition that one of normal skill in the art was familiar with block copolymers and block copolymerization and appreciated the significance of the term "block" when used to describe a significant portion of the polymer molecule.

Edmonds attached pages from the *Encyclopedia of Polymer Science and Technology* to support this contention. This reference used the term "block copolymer" to refer to polymers obtained by sequential polymeriza-

---

16. Since the district court adopted the Special Master's recommendations, this opinion uses "district court" when referring to the findings.

17. This is consistent with *Ex parte Mowry*, 91 U.S.P.Q. 219 (Patent Office Board of Appeals 1950), which defines the term "copolymers" to mean a product produced from the polymerization of "material amounts" of two components as distinct from the polymerization product of the individual components.

tion "in which the like monomer units occur in relatively long sequences." 2 *Encyclopedia of Polymer Science* 201 (1965). The reference also stated:

> In the majority of the syntheses that have been considered the block or graft copolymer is contaminated with at least one of the homopolymers of the species which make up the copolymer segments. Furthermore, in many of the syntheses the block copolymer is present as a minor fraction of the total polymeric material. Before these copolymers can be characterized it is necessary to isolate them from the homopolymers or random copolymers present in the polymerization product.

*Id.* at 216.

We do not read this excerpt as establishing that the term "block copolymer," as used by Edmonds, refers to any material which contains block copolymer molecules regardless of amount. The reference addresses a number of polymerization methods for obtaining block copolymers, and its references to ethylene-propylene block copolymers were subsequent to Edmonds' priority date. The excerpt does not address the claimed composition or process, nor does it define "minor fraction of the total polymeric material." Thus, unlike Phillips, we do not believe that this reference supports the contention that polymer products containing a relatively small portion of block copolymer molecules are necessarily within the scope of the claims. As properly construed, the claims require enough block copolymer molecules to allow the polymeric product to be classified as a block copolymer.

## 4.

Phillips further argues that the district court's claim construction is flawed because if the claims were read as construed by the district court, they would not cover Example III disclosed in the written description and because the district court's construction adds a limitation by restricting the claims to cover only block copolymer molecules. Phillips argues that no one can produce a block copolymer containing predominantly block copolymer molecules, thus showing the error in the district court's claim construction.

However, we find no support in the written description or the prosecution history for Phillips' contention that Example III of the patent discloses a "block copolymer" product in which block copolymer molecules are only a minor fraction of the entire product. While Example III discloses a process that produces a product in accordance with the claimed invention, the amount of block copolymer molecules in this product is not disclosed. The written description provides the physical properties of the product produced in Example III, suggesting that the entire product is a "block copolymer" as the term is used in the patent, but the Example fails to elucidate the meaning of "block copolymer."

## 5.

■ Finally, we conclude that the claims do not extend to blends or graft copolymers. The Examiner recognized that "blends or graft copolymers are not the equivalent of the block copolymers which are provided by the present invention." The Examiner reiterated this point during the '869 interference:

> [*Ex parte Schilling*, Patent file 3,200,173, Appeal No. 324–84, Paper No. 18 (Patent Office Board of Appeals 1965)] disclosed a process very similar to that of the present count wherein a Ziegler catalyst was contacted first with propylene and then with a mixture of ethylene and propylene to obtain a *blend* of polypropylene and copolymer. The prior art showed the same process steps as those claimed but disclosed that a *block* copolymer was obtained. The recitation "blend" was taken to import into the claim those necessary conditions for obtaining blends rather than block copolymers with the method of the claim. Here the same logic applies. Except for Burke et al the very objective of all the parties is to obtain block copolymers in distinction to grafts, blends, etc. Therefore the recitation "block copolymer" in the count limits process steps to those which will yield a block copolymer.

The Examiner used the logic applied in *Schilling* to again emphasize that Edmonds' claims were directed to "block copolymers to the exclusion of other products" such as

blends and graft copolymers.[18] We interpret these statements to preclude the claims from covering compositions or processes that produce blends or graft copolymers. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1438, 7 U.S.P.Q.2d 1129, 1135 (Fed.Cir.1988) (arguments made during the prosecution history and other aspects of the prosecution history are relevant in determining the scope and meaning of the claims); *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576, 34 U.S.P.Q.2d 1673, 1676 (Fed.Cir.1995) (the prosecution history limits the interpretation of claims to exclude interpretations disclaimed during prosecution). While we agree with Phillips' argument that the Schilling reference cannot be used as prior art, the Examiner referred to the proceedings before the Board in *Schilling* in explaining his logic, not as a basis for a prior art rejection. Given that the Examiner's reference to *Schilling* in explaining his logic is part of the prosecution history, we find nothing improper about using this portion of the prosecution history to elucidate the meaning of the claims.

### D.

Phillips argues that extrinsic evidence supports its proffered claim construction. In that regard, it points to Huntsman's and Aristech's internal documents and product data sheets that use the term "block copolymers," expert testimony, and the results of testing of the accused products, including scanning electron photomicrographs. However, we only consider extrinsic evidence "if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence." *Vitronics,* 90 F.3d at 1584, 39 U.S.P.Q.2d at 1578; *see Markman,* 52 F.3d at 980–81, 34 U.S.P.Q.2d at 1331 (extrinsic evidence, including expert testimony, may be used to understand the patent, but cannot vary or contradict the terms of the claims). This is not such a case.

### III.

■ Infringement, both literal and under the doctrine of equivalents, is a question of fact. *See SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1125, 227 U.S.P.Q. 577, 589 (Fed.Cir.1985) (in banc); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1255, 43 U.S.P.Q.2d 1666, 1668 (Fed.Cir.1997).

### A.

■ Phillips contends that Aristech's and Huntsman's products literally infringe claim 1 of the '719 patent because they contain block copolymer molecules and that their processes literally infringe claim 2 because they utilize sequential two-step polymerization. Phillips argues that the defendants' internal documents and product formulation sheets show that they manufacture and sell block copolymers. We cannot agree.

Phillips offered declarations from experts and photomicrographs attempting to show that Aristech and Huntsman produced block copolymers within the meaning of the claims. However, the evidence does not show whether the accused products contain, or the processes produce, block copolymer molecules and the amount, if present. We agree with the Special Master's conclusion that the expert declarations are "wholly conclusory, devoid of facts upon which the affiant[s'] conclusions, as experts, were reached." *Recommendations* at 19. Additionally, Phillips' expert could not say that the photomicrographs showed the presence of block copolymer molecules in the accused compositions and products. *See id.* at 35–38. Phillips' evidence fails to show or even suggest the presence of block copolymer molecules in the accused compositions and products and therefore fails to raise a genuine issue of material fact precluding summary judgment.

Assuming that the stipulated amounts of block copolymer molecules are present in defendants' products, we conclude that these amounts do not meet the limitations of claims 1 and 2 requiring the composition and the

---

18. We reiterate that we use "blend" to refer to a polymeric product, that is a mixture of homopolymers and/or copolymers, which lacks an appreciable quantity of block copolymer molecules. Our interpretation is consistent with the meaning of "blend" used by Edmonds throughout prosecution.

product of the process to be "block copolymers." As previously discussed, the term "block copolymer," as used in the patent, requires a sufficient quantity of block copolymer molecules to permit classification of the overall product as a block copolymer. The insignificant amounts of block copolymer molecules conceded to be in the defendants' products for purposes of the summary judgment motion of noninfringement, if present, would not be sufficient for the products to be classified as block copolymers within the scope of the claims.

The conceded amounts of block copolymer molecules in the defendants' products are of the same order of magnitude as impurities in the accused products, and are several orders of magnitude smaller than the amounts referenced in the excerpt from the *Encyclopedia of Polymer Science and Technology* that Edmonds submitted to the PTO to support his claim that "block copolymer" had a recognized meaning in the art. This *de minimis* amount of block copolymer molecules is insufficient to bring the accused products and processes within the scope of the claims.

While Aristech and Huntsman use two-step polymerization processes and their internal documents and product literature refer to block copolymer products, these facts are insufficient to raise a genuine issue of material fact precluding summary judgment. The accused products and processes do not literally satisfy the "block copolymer" limitation of claims 1 and 2, precluding a finding of infringement.

Additionally, the differences between the accused processes and the process of claim 2 further support our conclusion. The specification of the '719 patent states "that a catalyst system employing titanium tetrachloride as one of the catalyst components is not effective in producing" a block copolymer. '719 patent, col. 9, ll. 27–29. Both the Huntsman and the Aristech process use the titanium tetrachloride catalyst which Edmonds warns against. The accused processes also inject hydrogen, a known chain-terminating agent, into the reaction chambers during the process.

The injection of hydrogen into the homopolymer reactor would create dead polymer chains and prevent a second block from bonding to the ends of the propylene polymers, formed in the homopolymer reactor, in the copolymer reactor. Thus, the injection of hydrogen prevents the formation of block copolymer molecules in the two-reactor processes used by Huntsman and Aristech. Finally, the polymerization times in the two-reactor systems of the accused processes are substantially greater than those taught by Edmonds, reinforcing the conclusion that a block copolymer is not produced. The differences between the accused and claimed processes further support our conclusion of noninfringement.

## B.

■ Phillips argues that Aristech and Huntsman infringe claims 1 and 2 under the doctrine of equivalents. It asserts that the term "block copolymers" was added to the claims to more clearly define the invention, not to avoid the prior art, and that therefore prosecution history estoppel cannot limit the scope of equivalents given to the term.

■ The doctrine of equivalents must be applied on an element by element basis. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146, 41 U.S.P.Q.2d 1865, 1871 (1997). The accused products lack an appreciable quantity of block copolymer molecules, a necessary condition for a product to be considered a "block copolymer" as the term is used in the claims. To allow claims 1 and 2 to cover the accused products and processes would effectively read the "block copolymers" limitation out of the claims, which the Supreme Court held is not permissible. *See id.* ("It is important to ensure that the application of the doctrine [of equivalents], even as applied to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.").

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment of noninfringement. Phillips failed to raise a genuine issue of material fact concerning the composition of the accused products. On the

undisputed facts, the accused products and the processes by which they are produced do not infringe claims 1 and 2 of the '719 patent because they do not contain or produce "block copolymers" as required by the claims.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, concurring in the judgment.

I agree that summary judgment of non-infringement was properly granted, for the accused products were not shown, by the rules guiding summary judgment, to contain more than the conceded maximum amounts of 25 or 60 parts per million of block copolymer molecules. Phillips' theory requires that the accused products contain at least "a small but significant number of block copolymer molecules." The district court observed, correctly, that there was "no evidentiary showing of even a single block copolymer molecule made by the Defendants' processes." Phillips did not show, in accordance with summary judgment standards, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), that the conceded amount of block copolymer molecules is sufficient to impart the desired properties to the product.

Phillips argues that the defendants are practicing the technology described in the '719 patent, that the processes are not significantly different, and that the products must be the same, whatever their content of block copolymer molecules can be demonstrated to be. Phillips states that the claims must be construed in accordance with the body of the specification, and that Example III of the '719 patent, describing the preferred embodiment, produces a small but significant amount of block copolymer molecules. *See Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1550, 37 U.S.P.Q.2d 1609, 1612 (Fed.Cir.1996) (claims are rarely correctly construed in a way that excludes the preferred embodiment). While Phillips points out that the examiner agreed, in the course of the extensive patent prosecution, that no minimum amount of such molecules was "critical," this does not mean that the examiner agreed that the claims cover product containing no significant amount of block copolymer molecules.

There was expert testimony that in 1958, when the patent application was filed, it was not possible to make a block copolymer composition, with ethylene and propylene monomers, that contains a predominant amount of block copolymer molecules. There was expert testimony that less than a predominant amount of block copolymer molecules produced the observed high impact resistance. Indeed, Phillips' argument that the sequential process taught in the '719 patent was understood in 1958 to produce sufficient block copolymer to provide the desired advantageous properties was supported by expert testimony for both sides. Thus Phillips argues, as to the process claim, that any sequential polymerization of propylene and a mixture of ethylene and propylene using a Ziegler–Natta catalyst infringes the '719 patent, pointing out that the defendants believed they were making block copolymer molecules by their sequential polymerization process. Phillips argues that the lexicography of the term "block copolymer" should be understood in accordance with what is actually produced. Indeed, the record on summary judgment shows the recognition by experts for both sides that the usages and understanding of "block copolymer" varied greatly, over the thirty years between when the '719 application was filed and suit was brought.

The defendants point to differences between their processes and that of the '719 patent, as explaining why they obtain a product that they describe as purely a blend of polymer and copolymer, free of blocks attached end to end. Phillips' experts contradict these theories, explaining that the purportedly different catalyst (titanium tetrachloride) is converted to titanium trichloride in the conditions used, and explaining that the added hydrogen does not really "kill" the molecules in the ensuing polymerization. The panel majority, having rejected the expert testimony adduced at

the trial on the ground that it is "extrinsic," excludes itself from access to this evidence and whatever scientific truth it comports.

I believe it is seriously incorrect to foreclose consideration of such "extrinsic" evidence. It is increasingly recognized that courts must be enabled and encouraged to receive and understand the guidance of experts. The scientific witnesses for both sides agreed as to the uncertainties of this chemistry and the ensuing ambiguity of interpretation of the claims in light of the state of the art when the invention was made. This court's refusal to consider the evidence of experts for both sides (although it is mentioned, even as it is discounted) is not the path to enlightenment on the complexities of polymer chemistry and technology. Judicial doubt can not be resolved by exclusion of the evidence that explains the scientific issues.

However, on the record before us Phillips has not proffered evidence that the conceded amounts of 25–60 ppm were sufficient to impart block copolymer characteristics. Thus I would sustain the judgment of non-infringement.