**BIAGRO WESTERN SALES, INC., a California corporation, Plaintiff,**

v.

**HELENA CHEMICAL COMPANY, a Delaware corporation, Defendant.**

CIV. F. No. 01–5014 OWW DLB.

United States District Court, E.D. California.

May 7, 2001.

Mark Daryl Miller, Kimble MacMichael and Upton, Fresno, CA, for plaintiff.

James T. Hannick, Gray Cary Ware and Freidenrich, San Diego, CA, Ashley I. Pezzner, Rudolph E. Hutz, Connolly Bove Lodge and Hutz, LLP, Wilmington, DE, for defendant.

MEMORANDUM OPINION AND ORDER RE: PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

WANGER, District Judge.

## I. *INTRODUCTION*

Plaintiff, BIAGRO WESTERN SALES, INC., moves for a preliminary injunction against Defendant, HELENA CHEMICAL COMPANY. Jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1338. *See* Doc. 1, ¶ 5. Oral argument was held April 16, 2001.

## II. *BACKGROUND*

Plaintiff is a California corporation with its principal place of business in Visalia, California. *See* Doc. 1, ¶ 3. Plaintiff's sole business is the manufacture and sale of agricultural fertilizers derived from phosphorous acid. *See* Alvitre Dec., ¶ 3. On August 31, 1993, Plaintiff entered into an Exclusive License Agreement with The Regents of the University of California ("the Regents") to utilize technology replacing phosphates with phosphites as a nutrient source for plants. *See* Alvitre Dec., ¶ 2; Supp. Alvitre Dec., ¶ 2. Plaintiff's license includes the technology described in United States Patent No. 6,113,-665 ("the '665 Patent") issued September 5, 2000. *See id.* The '665 patent was issued to the Regents as the assignee of the inventor, Carol J. Lovatt. *See* Miller Dec., ¶ 2. Several of plaintiff's products use the formulation described in the patent at issue. *See* Alvitre Dec., ¶ 3.

Defendant is a Delaware corporation located in Memphis, Tennessee. *See* Doc. 1, ¶ 4. Defendant is authorized to do business, and does business, in California. Defendant is engaged in the manufacture, use, sale, and, or offering for sale in this district of products under the designation "Elemax 0–28–26" and "Elemax 4–30–20". *See id.* Defendant's products allegedly infringe the '665 patent. *See id.*

### A. *Alleged Infringement*

#### 1. *Testing of Defendant's Products*

Prior to the '665 patent's date of issuance, Plaintiff became aware that Defendant's, Ele–Max 0–28–26 and Ele–Max 4–30–20, might be infringing on the pending application of the '665 patent that was later issued. *See* Alvitre Dec., ¶ 4. Defendant's products were purchased and tested by Plaintiff for possible infringement. *See id.;* Steinberg Dec., ¶ 2. Samples of Defendant's products were sent to CMR Laboratories in Fresno. *See* Steinberg Dec., ¶¶ 3–4.

##### a. *pH Testing*

The pH scale is used to show whether a solution is acidic, neutral or alkaline. *See* Grech Dec., ¶ 14. A pH of 1 is the most acidic, a pH of 14 is the most alkaline, and a pH of 7 is considered neutral. *See id.* Although pure water itself is usually given a pH of 7, most available agricultural water is slightly acidic to slightly alkaline, with a pH ranging between 6.5 and 8.5. *See id.,* Ex. D (Western Fertilizer Handbook, 8th edition, p. 38).

*Testing on January 9, 2001*

On January 9, 2001, Mr. John L. Peterson of CMR Laboratories tested both sam-

ples of Ele–Max 0–28–26 and Ele–Max 4–30–20. *See* Peterson Dec., ¶¶ 2–3. The Ele–Max 0–28–26 was diluted with 6.5 pH water at ratios of 1:40 and 1:600. *See id.* at ¶ 3a. The 1:40 dilution had a 5.92 pH; the 1:600 dilution had a 6.16 pH. *See id.* The second Ele–Max 0–28–26 sample was then diluted with 8.5 pH water at ratios of 1:40 and 1:600. *See id.* at ¶ 3b. The 1:40 dilution had a 6.03 pH; the 1:600 dilution had a 6.40 pH. *See id.*

The Ele–Max 4–30–20 was diluted with 6.5 pH water at ratios of 1:40 and 1:600. *See id.* at ¶ 3c. The 1:40 dilution had a 4.71 pH; the 1:600 dilution had a 5.65 pH. *See id.* The second Ele–Max 4–30–20 sample was then diluted with 8.5 pH water at ratios of 1:40 and 1:600. *See id.* at ¶ 3d. The 1:40 dilution had a 4.88 pH; the 1:600 dilution had a 5.91 pH. *See id.*

Mr. Peterson asserts that fertilizer solutions within Defendant's products pH ranges (4.71–6.40) are commonly used for foliar nutritional application to plants. *See id.* at ¶ 4. However, Plaintiff's other expert, Mr. Nigel M. Grech, asserts that although the optimal foliage pH range for most plants is between 5.5 and 7.5, the range may fall below 5.5 and above 7.5 depending on the particular plant and the subsequent dilution of the final spray solution. *See* Grech Dec., ¶ 15.

*Testing on March 27, 2001*

On March 27, 2001, Mr. Peterson again tested Defendant's products for buffering properties. *See* Supp. Peterson Dec. at ¶ 2. Samples of Defendant's products (Ele–Max 4–30–20 and Ele–Max 0–28–26) were individually diluted each at the rates of 1:40 and 1:600 with de-ionized water and tap water. *See id.* The dilutions were titrated with 0.1 Molar Hydrochloric Acid, and the resultant pH readings were recorded and reported. *See id.*, Ex. A. Each of the eight dilutions were then titrated with 0.1 Molar Sodium Hydroxide, the re-

sultant pH readings were again recorded and reported. *See id.*

The tap and de-ionized water testing without Defendant's products was made to produce "blank" control data. *See id.* at ¶ 3. Samples of Defendant's products were also titrated in the same manner with 1.0 Molar Hydrocholoric Acid and again with 1.0 Molar Sodium Hydroxide. *See id.* These results are also reported in Mr. Peterson's attached Exhibit A. *See id.*

b. *Composition Testing*

In discussing the chemical compounds, the usual letters and subscripts are used. "K" stands for potassium, "H" for hydrogen, "P" for phosphorus and "O" for oxygen. *See* Helena Opp., 8:15 n. 8; Young Dec., ¶ 5. Subscript numbers indicate the number of atoms within the chemical structure. *See id.* The combination "HPO3" designates a "phosphite". *See id.*

When Phosphorous Acid, $H_3PO_3$, is combined with Potassium Hydroxide, KOH, two salts, Mono–Potassium Di–Hydrogen Phosphite, $KH_2PO_3$, and Di–Potassium. Mono–Hydrogen Phosphite, $K_2HPO_3$, are created in varying amounts. *See* Grech Dec., ¶ 5. These two salts are known as "phosphite salts" or "phosphites". *See id.* As more KOH is added, more $K_2HPO_3$ is created and the pH of the solution becomes more alkaline. *See id.*

For purposes of this motion, Defendant accepts Plaintiff's description of the phosphite salts present in Defendant's products. *See* Helena Opp., 8:11–13. Plaintiff's Grech Declaration describes Defendant's two Ele–Max products as follows:

Ele–Max 0–28–26 lists its ingredients as phosphorous acid, potassium hydroxide and water. *See* Grech Dec., ¶ 6, Ex. 1. The potassium salts are present in a total

amount of 53.9% by weight, of which $KH_2PO_3$ is 29% and $K_2HPO_3$ is 24.8%. *See* Helena Opp., 8:14–16; Grech Dec., ¶¶ 5–7.

Ele–Max 4–30–20 lists its ingredients as phosphorous acid, potassium hydroxide, urea and water. *See* Grech Dec., ¶ 10, Ex. 1. Its total salt content is 52.91% by weight, of which 33.36% is $KH_2PO_3$, and 11.85% is $K_2HPO_3$. *See id.* at 9:1–3; Grech Dec. ¶¶ 10–11.

Defendant disputes Mr. Grech's conclusion that both of Defendant's products are buffered compositions. *See* Helena Opp., 23:14–26:5. Mr. Grech's Declaration states with regard to buffering:

> Both of the above described Ele–Max products (0–28–26 and 4–30–20) are buffered compositions. A buffered solution is one that resists changes in pH. See *Chemistry of the Elements*, 2nd edition, p. 521.... Both of the Ele–Max products (0–28–26 and 4–30–20) resisted changes in pH; they are therefore buffered compositions.
>
> Grech Dec. at ¶ 13.

### 2. *Negotiation History*

Subsequent to the issuance of the '665 patent, Mr. Peter Alvitre met with Defendant's representatives in Memphis, Tennessee. *See* Alvitre Dec., ¶ 6. Mr. Alvitre provided Defendant a copy of the '665 patent and alerted Defendant to the possible infringement of the '665 patent, 5,830,-255 patent, and 5,514,200 patent, by Defendant's products.

Defendant disputed Mr. Alvitre's assertions of infringement. *See* Miller Dec., ¶ 3, Ex. B. Besides raising several prior art issues, Defendant asserted that the '665 patent required a separate buffering agent and that Defendant's products contained no such agent. *See id.* Plaintiff's counsel argued that a buffer could be defined as "a material which resists changes in pH" and that both of Defendant's products met this definition. *See id.*

On December 28, 2000, Plaintiff discovered that Defendant had been awarded a substantial contract to provide its products to a company in Florida. *See* Alvitre Dec., ¶ 7; McLean Dec., ¶¶ 3–4. Plaintiff had also submitted a bid of $717,500 on the contract. *See* McLean Dec., ¶ 2. The fertilizer products used in Defendant's bid were the Ele–Max 0–28–26 and Ele–Max 4–30–20. *See id.* at ¶ 4.

Plaintiff's complaint was filed January 3, 2001; however, Defendant was not immediately served due to negotiations between Plaintiff and Defendant toward a potential resolution. *See* Alvitre Dec., ¶¶ 05, 8. Defendant was served with the complaint on February 5, 2001, when Plaintiff determined that a resolution would not be reached. *See id.,* ¶ 7.

### B. *Plaintiff's Complaint*

Plaintiff's complaint alleges one claim of patent infringement. *See* Doc. 1. Plaintiff asserts it is the exclusive licensee of the Regents' '665 patent; that Defendant at all relevant times knew of Plaintiff's patent; that Defendant directly infringed or engaged in contributory infringement of the '665 patent; and that it has been irreparably harmed and continues to be harmed. *See id.,* ¶¶ 9–11.

Plaintiff requests that Patent No. 6,113,-665 be adjudged a legally enforceable and valid patent; that Defendant be found to be infringing the Regents' patent; a preliminary and permanent injunction be ordered enjoining Defendant from further infringement; and an accounting of all profits received by Defendant as a result of its alleged infringement. *See id.,* ¶¶ 5–6. Plaintiff requests compensatory and punitive damages, attorneys fees and costs, and a trial by jury. *See id.,* 1:18–19, ¶¶ 7–9.

## C. *Defendant's Evidentiary Objections*

Defendant objects to three items contained in Plaintiff's Reply submissions: (1) Mr. Mark D. Miller's Reply Declaration and its attached Declaration of Mr. A.W. Frazier; (2) the Supplemental Declaration of John L. Peterson, specifically his subsequent testing and analysis of Defendant's products conducted on March 27, 2001; and (3) the portions of the Supplemental Declaration of Mr. Nigel M. Grech referring to Mr. Peterson's Supplemental Declaration.

Defendant asserts that Mr. Miller's Reply Declaration is an attempt to introduce Mr. A.W. Frazier's Declaration into evidence. Defendant asserts that it has been denied the opportunity to depose Mr. Frazier in regards to his declaration. Defendant asks that Mr. Miller's Declaration, and especially Mr. Frazier's Declaration be stricken from consideration.

Defendant also asserts that the retesting of Defendant's products by Mr. Peterson on March 27, 2001 should also be stricken from consideration. Although Defendant was granted limited discovery for deposing Plaintiff's experts and testing Plaintiff's assertions, Defendant has not been able to depose Mr. Peterson as to the re-tested samples because the March 27, 2001 testing came after the close of limited discovery. Defendant requests that paragraphs 10, 11 and 12 of Mr. Grech's Supplemental Declaration, which rely on Mr. Peterson's new test results, also not be considered.

## D. *Supplemental Submissions From Oral Argument*

At oral argument, Defendant submitted several cases for consideration: *Application of Lamberti,* 545 F.2d 747 (1976); *Application of Boe,* 53 C.C.P.A. 1079, 355 F.2d 961 (1966); *Constant v. Advanced Micro–Devices,* 848 F.2d 1560 (Fed.Cir. 1988); *Hazani v. United States International Trade Commission,* 126 F.3d 1473 (Fed.Cir.1997); and *Celeritas Technologies, Ltd., v. Rockwell International Corporation,* 150 F.3d 1354 (Fed.Cir.1998). Defendant's cases were cited for: (1) a patent is defined by its claims, a patentee cannot distinguish over the prior art by arguing limitations not recited in the claims; and (2) non-preferred, as well as preferred, embodiments of the patent should be considered in analyzing the prior art. Plaintiff was invited to respond to Defendant's use of these cases.

Plaintiff's "Supplemental Memorandum of Points and Authorities" does not mention Defendant's submitted cases, but largely repeats arguments made at oral argument and it's previously submitted papers. Plaintiff does submit *U.S. v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), for the proposition that "the nature of the claimed invention (as being a clear liquid devoid of precipitate) can be used to distinguish over prior art even though not a claim limitation." *See* "Supplemental Memorandum of Points and Authorities", April 20, 2001, at 4:1–4. Plaintiff has had ample opportunity to address the arguments raised by Defendant. To the extent that Plaintiff's brief does not address Defendant's submitted cases and repeats previously raised arguments, Plaintiff's Supplemental Memorandum is DISREGARDED.

Defendant has also submitted a "Response Declaration of Greg Volgas In Support of Helena Chemical Company's Opposition to Biagro's Motion For Preliminary Injunction". Mr. Volgas' Declaration was submitted in response to arguments raised in Plaintiff's Reply Brief. In his declaration, Mr. Volgas disputes Plaintiff's assertion that he improperly filtered the tested samples to achieve a solution with no precipitates. He states the filtration was only necessary because the commercial starting material (phosphorous acid) contained

some insoluble materials. Mr. Volgas stated that the insolubles did not affect the tested samples. Plaintiff was invited to respond to Mr. Volgas' Response Declaration.

Plaintiff has submitted a "Supplemental Declaration of Nigel M. Grech" in response. Mr. Grech's Declaration is not confined to the limited topic of filtration and Defendant's asserted reasoning. Mr. Grech alleges several new mixing improprieties, not previously raised, in Mr. Volgas' testing methodology. Plaintiff has exceeded the scope of Mr. Volgas' limited declaration. To the extent Plaintiff's "Supplemental Declaration of Nigel M. Grech" does not address Mr. Volgas' asserted reasons for filtration, the "Supplemental Declaration of Nigel M. Grech" is DISREGARDED.

### III. *LEGAL STANDARD*

#### A. *Preliminary Injunction*

The grant or denial of a preliminary injunction under 35 U.S.C. § 283 (1994) is within the sound discretion of the district court. *See Novo Nordisk of N. Am., Inc., v. Genentech, Inc.,* 77 F.3d 1364, 1367 (Fed.Cir.1996).

■ The moving party is entitled to a preliminary injunction if it can succeed in showing: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001); *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Ab-*

*bott Labs.,* 849 F.2d 1446, 1451 (Fed.Cir. 1988).

A movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm. *See Amazon,* 239 F.3d at 1350; *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1088 (Fed.Cir.1998) (citing *Reebok Int'l,* 32 F.3d at 1555).

■ To demonstrate a likelihood of success on the merits, a movant must show that in light of the presumptions and burdens that will inhere at trial on the merits, (1) the movant will be likely to prove patent infringement, and (2) the movant's infringement claim will likely withstand challenges to the patent's validity and enforceability. *See Genentech, Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1364 (Fed. Cir.1997). If the opposing party raises a substantial question concerning either infringement or patent validity, *i.e.,* asserts an infringement or invalidity defense that the patentee cannot prove lacks "substantial merit," the preliminary injunction should not issue. *See id.*

■ Irreparable harm is presumed when a clear showing of patent validity and infringement has been made. *See Amazon,* 239 F.3d at 1350. "This presumption derives in part from the finite term of the patent grant, for patent expiration is not suspended during litigation, and the passage of time can work irremediable harm." *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 708 (Fed.Cir.1997).

#### B. *Patent Infringement*

Patent infringement analysis involves two steps: (1) the claim scope is first determined, and then (2) the properly construed claim is compared with the accused device to determine whether all of the

claim limitations are present either literally or by a substantial equivalent. *See Amazon,* 239 F.3d at 1351; *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1141 (Fed.Cir.1997). "The essential inquiry is whether 'the accused product or process contains elements identical or equivalent to each claimed element of the patented invention.'" *Litton Systems Inc. v. Honeywell Inc.,* 140 F.3d 1449, 1454 (Fed.Cir.1998) citing *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 39–41, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997).

*Sextant Avionique, S.A. v. Analog Devices, Inc.,* 172 F.3d 817 (Fed.Cir.1999) explains:

> The first step, claim construction, is a question of law, which we review de novo. *See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456, 46 U.S.P.Q.2d 1169, 1174 (Fed.Cir.1998) (*en banc*). The second step is factual. *See North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1574, 28 U.S.P.Q.2d 1333, 1335 (Fed.Cir.1993). When construing a claim, a court principally consults the evidence intrinsic to the patent, *viz.,* the claims themselves, the written description portion of the specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–83, 39 U.S.P.Q.2d 1573, 1576–77 (Fed.Cir.1996). 172 F.3d at 825.

1. *Claim Construction Analysis Overview*

 In interpreting the meaning of an asserted patent claim, a court should first refer to the following sources of intrinsic evidence—the patent claims, the specification, and the prosecution history. *See Phillips Petroleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 870 (Fed. Cir.1998); *Vitronics Corp.,* 90 F.3d at 1582. Intrinsic evidence alone will usually be sufficient to resolve any ambiguities in disputed claim terms. *See Vitronics Corp.,* 90 F.3d at 1583. In such cases, the Court should not even consider any extrinsic evidence. *Id.*

a. *Patent Claims*

 In construing the meaning of disputed claim terms, the Court first looks to the words (both asserted and nonasserted) of the claims themselves. *Id.* at 1582. Words are generally given their ordinary and plain meaning, although a patentee may choose to be a lexicographer and define a word in a way other than its ordinary meaning. *Id.* In order to ascribe a special definition to a claim term, the definition must be clearly stated in the patent specification or the file history. *Id.* (citing *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996)).

b. *Specification Language*

██ ██ It is also necessary to review the specification to determine whether any of the claim terms have been used in a manner inconsistent with their ordinary meaning. *See Vitronics,* 90 F.3d at 1582. The specification can define terms either explicitly or by implication. *Id.* (citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.), (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996)). Though claims should always be read in view of the specification, the Federal Circuit cautions that the scope of a claim should not be limited to specific embodiments disclosed in the specification. *See, e.g., Ekchian v. Home Depot, Inc.,* 104 F.3d 1299, 1303 (Fed.Cir. 1997); *Intervet America, Inc. v. Kee–Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed.Cir. 1989). Nonetheless, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the

meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

### c. *Prosecution History and Extrinsic Evidence*

■■■■ The prosecution history of the patent provides a complete record of all proceedings, including all express representations made by the patent applicant, before the Patent and Trademark Office. *Id.* The file history can limit the scope of a claim term so as to exclude an interpretation disclaimed during prosecution. *Id.* at 1583 (citing *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed.Cir. 1995)). In addition, any prior art cited during the prosecution history may indicate what the patent claims do not cover. *See Vitronics*, 90 F.3d at 1583 (citing *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 399 (Ct.Cl.1967)).

■■■■ Extrinsic evidence, such as expert testimony, may be resorted to only for interpretation of terms used in the claim and specification when their meaning is in dispute or ambiguous. *See Vitronics*, 90 F.3d at 1584–85.

### 2. *Patent Language*

A patent is a fully integrated document; it must set out a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains" to practice the invention. 35 U.S.C. § 112. "A patent must describe the exact scope of an invention and its manufacture to secure to [the patentee] all to which he [or she] is entitled, [and] to apprise the public of what is still open to them." *Markman*, 517 U.S. at 373, 116 S.Ct. 1384. "[T]he language of the claim defines the scope of the protected invention." *Bell Communications Research, Inc. v. Vitalink Communications, Corp.*, 55 F.3d 615, 619 (Fed.Cir.1995); *see also Vitronics*, 90 F.3d at 1582.

■■■■ The words of the claim are interpreted in accordance with their ordinary meaning, as understood by a person reasonably skilled in the art. *See Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed.Cir.), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996); *Vitronics*, 90 F.3d at 1582; *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir.1992); *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 759 (Fed.Cir.1984). Technical terms should be construed from the perspective of a person experienced in the field of the invention. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d, 1146, 1153 (Fed.Cir.), *cert. denied*, 522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998) (quoting *Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.1996)). A claim should not be construed in a manner that renders the claim language "meaningless or superfluous." *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993).

### 3. *Specifications*

The claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. Section 112 provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

■■■■ 35 U.S.C. § 112. The specification is reviewed "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582; *CVI/Beta Ventures*, 112 F.3d at 1153. If the inventor

uses a term in a manner other than its ordinary meaning, that meaning is given effect because the inventor is free to be his or her own lexicographer. *See Vitronics,* 90 F.3d at 1582 (citing *Hoechst Celanese Corp. v. BP Chemicals, Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996)). In this regard, the specification "may act as a sort of dictionary." *Markman,* 52 F.3d at 979; "expressly defin[ing] terms used in the claims or when it defines terms by implication." *Vitronics,* 90 F.3d at 1582.

The court has an independent obligation to determine the meaning of the patent, regardless of the arguments advanced by the parties, *see Exxon Chemical Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1556 (Fed.Cir.1995); neither party's interpretation may be correct. *Id.* ("judge's task is not to decide which of the adversaries is correct"). The objective of claim construction analysis is to ascertain the meaning that a person of ordinary skill in the art would give to the claims in dispute. *See Wiener v. NEC Electronics, Inc.,* 102 F.3d 534, 539 (Fed.Cir.1996); *Haynes International, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1578 n. 4 (Fed.Cir.1993).

When using the specification to define a term in the claim, however, it is recognized "[t]here is a fine line between the use of the specification to clarify otherwise cloudy terms in the claim and the extraction of limitations from the specification to impose those limitations on the claim." *CVI/Beta Ventures,* 112 F.3d at 1158; *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994); *In Re Van Geuns,* 988 F.2d 1181, 1184 (Fed.Cir.1993).

### 4. *Prosecution History*

When construing the language of a claim, the prosecution history of the patent also should be considered, provided that it is in evidence. *See Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.), *cert. denied,* 516 U.S. 987,

116 S.Ct. 515, 133 L.Ed.2d 424 (1995); *Markman,* 52 F.3d at 980; *Vitronics,* 90 F.3d at 1582 (citing *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)); *CVI/Beta Ventures,* 112 F.3d at 1155. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics,* 90 F.3d at 1582.

The prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall,* 54 F.3d at 1576; *see CVI/Beta Ventures,* 112 F.3d at 1155. However, the prosecution history "cannot enlarge, diminish, or 'vary' the limitations in the claims." *Markman,* 52 F.3d at 980 (quoting *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880)).

The applicant's choice to impose limitations on his own claims in order to demonstrate the invention's novelty must be given effect. *Litton* recognized that an amendment made for reasons other than patentability may still give rise to an estoppel. 140 F.3d at 1458. For example, "if an applicant makes an amendment unrelated to patentability which evinces an unmistakable surrender, that action will preclude recapture of the surrendered subject matter under the doctrine of equivalents." *Id.* Having so limited the meaning of the patent's claims, an inventor may not be heard to contend that the patent's scope is much broader than stated. *See, e.g., Senmed, Inc. v. Richard–Allen Medical Indus., Inc.,* 888 F.2d 815, 819 n. 9 (Fed. Cir.1989). "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.,* 431 F.2d 539, 544 (5th Cir.1970) (citing *White v. Dunbar,* 119 U.S. 47, 51, 7 S.Ct. 72, 30 L.Ed. 303 (1886)).

### 5. *Extrinsic evidence*

■■■ Extrinsic evidence is "all evidence external to the patent, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 979, 980. Extrinsic evidence may be consulted during construction of a claim to assist with the understanding of "scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman*, 52 F.3d at 980; *see Vitronics*, 90 F.3d at 1584. Extrinsic evidence may be received to aid in " 'coming to a correct conclusion' as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 979 (citations omitted). Moreover, if, after consideration of all available intrinsic evidence, there still is some genuine ambiguity in the claims, extrinsic evidence may be consulted to interpret the meaning of the language used in the claim. *See Vitronics*, 90 F.3d at 1584. Extrinsic evidence cannot be used, however, for the purpose of varying or contradicting the terms of the claims. *See id.*

## IV. *ANALYSIS*

### A. *Standing*

■■■ Defendant raises the issue that Plaintiff lacks standing to bring its patent infringement suit and attendant request for injunctive relief. *See* Helena Opp., 1:23–2:5. Defendant asserts that because Plaintiff has not joined the actual owner of the '665 patent, the Regents, Plaintiff does not have standing. *See id.* The Regents are an asserted indispensable party; Defendant plans to dismiss Plaintiff's complaint on this basis. *See id.*

"The presumption of the patent's validity created by 35 U.S.C. § 282 'does not relieve a patentee from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity." *Helifix Ltd. v. Blok–Lok, Ltd.*, 208 F.3d 1339, 1351 (Fed. Cir.2000) (quoting *New England Braiding v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed.Cir.1992) (affirming denial of preliminary injunction where petitioner could not show that he was the likely inventor of the patent)).

Standing to bring a patent infringement suit is described by 35 U.S.C. § 281, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *see Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1130 (Fed.Cir.1995). However, where an exclusive licensee has obtained all substantial rights in a patent, the exclusive licensee is treated as an assignee and gains the right to bring a patent infringement suit in its own name. *See Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed.Cir.2001).

Plaintiff's complaint states that "Biagro, under license from The Regents, is the exclusive licensee of all of the rights under the '655 Patent." Doc. 1, ¶ 9. The factual contents of a plaintiff's complaint are generally accepted as true. *See Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir.1998). Defendant has no evidence to dispute Plaintiff's assertion at this time. For purposes of this motion, Plaintiff demonstrates standing and may enforce the rights and remedies outlined in the Patent Act. *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989) (defendant must first submit evidence by affidavit or otherwise showing a dispute as to a plaintiff's standing; burden then shifts to plaintiff to show otherwise).

### B. *Claim Construction*

Plaintiff asserts that Defendant's products infringe claims 1, 7, 13, and 19 of the '665 patent. *See* Doc. 1.

"A claim must be construed before determining its validity just as it is first construed before deciding infringement." *Markman,* 52 F.3d at 996 n. 7. Only when a claim is properly understood can a determination be made whether the claim "reads on" an accused device or method, or whether the prior art anticipates and, or, renders obvious the claimed invention. *See id.* Because the claims of a patent measure the invention at issue, the claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 859 F.2d 878, 882 (Fed.Cir.1988).

Each patent claim contains "[a] concentrated phosphorus fertilizer comprising a buffered composition comprising at least one phosphorous-containing acid or salt thereof". *See* Alvitre Dec., Ex. A (" '665 Patent"). Each claim uses the same language changing only the pH level and ratio of fertilizer to water. *See id.* The differing language of each claim has been underlined for convenience.

Claim 1 states:

A concentrated phosphorus fertilizer comprising a buffered composition comprising *at least* one phosphorous-containing acid or salt thereof such that when said composition is diluted with water *having a pH of about 6.5 at a ratio of about 1 part fertilizer to about 40 parts water,* there is formed a substantially fully solubilized use-dilution fertilizer having a foliage-acceptable pH for phosphorus uptake and wherein said phosphorous-containing acid or salt thereof is present in an amount of about 30 weight percent or greater.

Claim 7 states:

A concentrated phosphorus fertilizer comprising a buffered composition comprising a phosphorous-containing acid or salt thereof such that when said composition is diluted with water *having a pH*
*as high as about 8.5 at a ratio of about 1 part fertilizer to about 40 parts water,* there is formed a substantially fully solubilized use-dilution fertilizer having a foliage-acceptable pH for phosphorus uptake and wherein said phosphorous-containing acid or salt thereof is present in an amount of about 30 weight percent or greater.

Claim 13 states:

A concentrated phosphorus fertilizer comprising a buffered composition comprising a phosphorous-containing acid or salt thereof such that when said composition is diluted with water *having a pH of about 6.5 at a ratio of about 1 part fertilizer up to about 600 parts water,* there is formed a substantially fully solubilized use-dilution fertilizer having a foliage-acceptable pH for phosphorus uptake and wherein said phosphorous-containing acid or salt thereof is present in an amount of about 30 weight percent or greater.

Claim 19 states:

A concentrated phosphorus fertilizer comprising a buffered composition comprising at least one phosphorous-containing acid or salt thereof such that when said composition is diluted with water *having a pH of about 8.5 at a ratio of about 1 part fertilizer up to about 600 parts water,* there is formed a substantially fully solubilized use-dilution fertilizer having a foliage-acceptable pH for phosphorus uptake and wherein said phosphorous-containing acid or salt thereof is present in an amount of about 30 percent weight or greater

▆▆▆ The parties' dispute is based on differing interpretations of what the '665 patent claims as a "buffered composition". Plaintiff asserts that a buffered composition is an observed resistance to change in pH. *See* Doc. 7, 7:11–17; Grech Dec., ¶ 13. Plaintiff also contends that the phosphite

salts themselves may accomplish the buffering features described by the patent. *See* Biagro Reply, 12:19–26. Defendant argues that the '665 patent requires a separate buffering agent, besides phosphorous acid or its salts, to be added to the fertilizer concentrate to consider it a "buffered composition". *See* Helena Opp., 16:13–26:5.

The term, "buffered composition", is not defined in the patent. The inquiry turns to the intrinsic evidence presented, the remaining patent language and prosecution history. The extrinsic evidence will be considered only if the intrinsic evidence is insufficient to resolve the ambiguity. *See Phillips Petroleum Co.,* 157 F.3d at 876 (extrinsic evidence should not be considered if no ambiguity exists after analyzing the intrinsic evidence).

### a. *Prosecution History*

Because the remaining patent language of the '665 patent may be best understood in light of its prosecution history, the '665 patent's prosecution history will be analyzed first before turning to the remaining patent specifications and language.

Under the section entitled, "Related U.S. Application Data", the '665 patent states that it is a "Continuation of application No. 08/642,574, May 3, 1996, Pat. No. 5,830,255, which is a continuation of application No. 08/192,508, Feb. 7, 1994, Pat. No. 5,514,200." Doc. 12, Ex. A, ("[63]"). Patent No. 5,830,255 (" '255 patent") is the parent patent to the '665 patent. Patent No. 5,514,200 (" '200") is the grandparent patent to the '665 patent, and parent to the '200 patent. *See id.* at Ex. 34.

### '200 Grandparent Application

Throughout the grandparent patent to the '665 patent, the "buffered composition" is referenced as containing two elements: (1) "an organic acid and salts thereof", and (2) a "phosphorous-containing acid and salts thereof." As stated in the "Abstract" of the grandparent patent:

Concentrated phosphorus fertilizers are disclosed that comprise a buffered composition of an organic acid *and* salts thereof and a phosphorous-containing acid and salts thereof.

*See* Helena Opp., Ex. 34[54] (" '200 Patent"), "Abstract" [57] (emphasis added). As stated in the "Summary of the Invention":

The above objects and features are accomplished by a concentrated phosphorus fertilizer comprising a buffered composition comprising an organic acid and salts thereof *and* a phosphorous-containing acid and salts thereof.

See id., 3:11–14 (emphasis added). As also later described by the "Detailed Description of the Invention": "The fertilizer comprises a double or multiple buffer system of organic acids *and* their salts with a phosphorous-containing acids and their salts." *See id.* at 3:47–49 (emphasis added).

Finally, all claims as issued contain the following language:

A concentrated phosphorus fertilizer comprising a buffered composition comprising an organic acid and salt thereof *and* a phosphorous containing acid ... and salts thereof....

*See id.* at 8:47–9:18 (emphasis added). The purpose of the organic acid is to allow the formation of a buffered composition, maintaining the pH within a foliage acceptable range. *See id.* at 4:34–36 ("suitable organic acids are those that help provide a 'buffered composition' having the desired pH range."). The organic acid also "maintain[s] the phosphite ion in a substantially fully solubilized form upon dilution with water at pH varying from about 6.5 to about 8.5 and that result in a use-dilution fertilizer having a foliage-acceptable pH

for phosphorus uptake." The organic acid provides the means of delivery of phosphorus to the plant.[1] This method of delivery, is a distinguishing feature from other fertilizers comprising only of simple phosphite salts.[2] Although several suitable organic acids are described to act as suitable buffers and means of delivery, the phosphorus-containing acid is never mentioned.

The addition of the organic acid and its effects are a distinguishing feature of the described invention. The organic acid allows increased solubility and higher concentrations of phosphorus to be delivered to the plant.

> The increased solubility of these formulation over that of phosphate of phosphite fertilizers makes it possible to prepare fertilizers with a greater concentration of phosphorus per unit volume than traditional phosphate or polyphosphate fertilizers *or the simple unbuffered salts of phosphorous acid recently being marketed as fertilizers for foliar application which are available as super saturated solutions with only about 16% phosphite, and which are diluted approximately 1:100 to about 1:300.*

*See id.* at 4:55–64.[3]

*'255 Parent Application*

The parent application also describes a "buffered composition" as having two elements: (1) "an organic acid and salts

1. "A method of providing phosphorus to plants is also disclosed. The method comprises diluting a concentrated phosphorus fertilizer comprising a buffered composition comprising an organic acid and salts thereof and a phosphorous-containing acid and salts thereof with water to form a substantially fully solubilized use-dilution fertilizer having a pH in a range acceptable for foliar uptake of phosphorus and applying the fertilizer to the plant foliage." *Id.* at 3:34–42.

2. "The form in which the phosphorous is supplied in these formulations is more mobile

thereof", and (2) a phosphorous-containing acid and salts thereof. As described in the "Abstract":

> Concentrated phosphorus fertilizers are disclosed that comprise a buffered composition of an organic acid and salts thereof and a phosphorous-containing acid and salts thereof.

*See id.*, Ex. 3[57]. As stated in the "Summary of the Invention":

> The above objects and features are accomplished by a concentrated phosphorus fertilizer comprised a buffered composition comprising an organic acid and salts thereof *and* a phosphorous-containing acid and salts thereof.

*Id.* at 3:17–20 (emphasis added). The "Detailed Description of the Invention" again describes at least two elements comprising the phosphorus-based fertilizer: "The fertilizer comprises a double or multiple buffer system of organic acids *and* their salts with a phosphorous-containing acids and their salts." *Id.* at 3:52–54 (emphasis added).

The purpose of the organic acid is repeated as allowing the formation of a buffered composition, maintaining the pH within a foliage acceptable range. *See id.* at 4:39–41 ("suitable organic acids are those that help provide a 'buffered composition' having the desired pH range."). And, as repeated in claim 4:

than phosphate fertilizers or than the simple salts of phosphorous acid recently being sold as fertilizers, and thus more available and more readily taken up by the roots of the plants." *Id.* at 5:61–65.

3. Although, the underlined portion was later deleted by Certificate of Correction, Defendant contends that the statement, nonetheless, stands as an admission and that the propriety of such deletion will be an issue at trial. *See* Helena Opp., 21:26–27, fn. 16.

[S]aid buffered composition comprises at least one organic acid or salt thereof in amount to form a double or multiple buffer with said phosphorus-containing acid agent.

*See id.* at 8:57–60. The phosphorus-containing acid and salts are not mentioned as helping to provide the buffering attributes of the fertilizer. Rather, the phosphorus-containing acid and salts are treated as the fertilizing agent to be combined with the organic acid and salts to form the buffered composition.

The organic acid is again described as increasing solubility and allowing higher concentrations of phosphorus to be delivered to the plant.[4] The parent patent application repeats the contrast between the patent invention and fertilizers containing only the simple salts of phosphorous acid.[5]

Finally, while the '255 patent claims still require "[a] concentrated phosphorus fertilizer comprising a buffered composition comprising a phosphorous-containing acid or salt thereof", the reference to "an organic acid or salts thereof" is not repeated within the independent claim. *See id.* at 8:42–9:43–12:16. The "organic acid or salts" reference is made, however, in the dependent claims: 4–6, 14–16, 24–26 and 34–36.

b. *Remaining '665 Patent Language*

The '665 patent deletes many of the references to the presence of "an organic buffer and salts thereof" without explana-

tion. *See* Helena Opp., Ex. 2[57] ("'665 Patent"). The "Abstract" now reads:

Concentrated phosphorus fertilizers are disclosed that comprise a buffered composition of a phosphorus-containing acid or salt thereof.

*Id.* However, the "Summary of the Invention" states that the phosphorus fertilizer invention will contain at least two elements: (1) a buffered composition, *and* (2) a phosphorous-containing acid and salts thereof.

The above objects and features are accomplished by a concentrated phosphorus fertilizer comprising a buffered composition *and* a phosphorous-containing acid and salts thereof.

*Id.* at 3:17–20 (emphasis added). In addition, the patent again describes a buffered composition as containing at least two separate and distinct elements: (1) "an organic acid and salts thereof" and, (2) "a phosphorous-containing acid and salts thereof".

[A] concentrated phosphorus fertilizer comprising a buffered composition comprising an organic acid and salts thereof *and* a phosphorous-containing acid and salts thereof....

*Id.* at 3:40–44 (emphasis added). As also stated in the "Detailed Description of the Invention":

The properties of phosphite that make it desirable as a fertilizer are enhanced when it is formulated according to the present invention as a double or multiple buffer with phosphorous acid ... and

---

4. "A method of providing phosphorus to plants is also disclosed. The method comprises diluting a concentrated phosphorus fertilizer comprising a buffered composition comprising an organic acid and salts thereof and a phosphorous-containing acid and salts thereof with water to form a substantially fully solubilized use-dilution fertilizer having a pH in a range acceptable for foliar uptake

of phosphorus and applying the fertilizer to the plant foliage." *Id.* at 3:26–47.

5. "The form in which the phosphorus is supplied in these formulations is more mobile than phosphate fertilizers or than the simple salts of phosphorous acid, and thus more available and more readily taken up by the roots of plants." *Id.* at 5:62–65.

their respective salts *and* organic acids and their salts per this invention.

*Id.* at 3:65–4:5. The addition of the organic acid and its effects are a repeated distinguishing feature of the invention. Suitable "organic acids" counteract the "tendency for phosphite to precipitate if diluted with alkaline water". *See id.* at 4:19–22. This increase in solubility caused by the organic acid allows for greater concentrations of phosphorus to be delivered to the plant.[6] The enhanced formulations of the invention are then said to "result in greater uptake of phosphorus by the canopy of plants than traditional phosphate or recent phosphite fertilizers not formulated in this manner". *Id.* at 5:2–4. The described buffered formulations were again contrasted with simple phosphite salts.[7]

Despite the changes made from the grandparent and parent patent to the '665 patent, the patent invention phosphorus fertilizers generally requires at least two elements: (1) a phosphorous containing acid and (2) an organic acid.[8] The mixture between these two elements provides the mixture with buffering capabilities described in the patent.[9]

*Plaintiff's Reply: No Separate Buffering Agent Required*

Plaintiff asserts that the '665 language does not require a separate buffering agent and that the phosphorus-containing acid and salts themselves may act as the buffering agent. *See id.* at 12:19–20, 25–26, 13:4–5. Plaintiff cites to the language of Example 9 which has remained constant throughout the grandparent and parent patents. *See* Biagro Reply 13:5–8. Example 9 of the '665 patent states:

A formulation was prepared of 1 gallon of 0–30–0 fertilizer having 57% copper with 2.89 lbs. $H_3PO_3$, 7.3 lbs. $Cu(OH)_2$ (57% Cu), and 1.34 lbs. Of 58% $NH_4OH$. Two quarts can be added to as little as 20 gallons of water of pH 6.5 to 8.5. The pH of the final solution is between 5.5 to 6.5. The copper is not fully soluble, however this is desirable in that it prevents the rapid uptake of copper when applied to plant foliage.

*See* '655 Patent (Helena Opp., Ex. 2), 8:37–46. Example 9 describes a formulation of copper and a phosphorous containing acid and salts, no organic acid and salts have been added. *See id.* However, the copper formulation is still described as providing the formulation with the buffering capabilities. As stated by the "Detailed Description of the Invention":

Formulations can [sic] also prepared with copper. However, when high concentrations of copper are used, the copper is not fully solubilized. In this situation, the insoluble copper minimizes the potential for copper toxicity. As the insoluble copper is rewetted over night

---

6. "These formulations allow the maintenance of continued solubility, and thus availability for uptake by plants, of phosphorus, with or without nutrients, over a significantly wide range of concentrations and pHs. The increased solubility of these formulation over that of phosphate of phosphite fertilizers makes it possible to prepare fertilizers with a greater concentration of phosphorus per unit volume than traditional phosphate or polyphosphate fertilizers." *Id.* at 4:55–62.

7. "The form in which the phosphorus is supplied in these formulations is more mobile than phosphate fertilizers or than the simple salts of phosphorous acid recently being sold as fertilizers and thus more available and more readily taken up by the roots of plants." *Id.* at 5:60–64.

8. "The phosphorus fertilizers are prepared by first forming solutions of the phosphorous and organic acids. Other desired nutrients can then be added with constant stirring." *Id.* at 6:22–24.

9. "The amount of phosphorous relative to organic acid is not critical, as long as appropriate buffering and solubility are achieved." *Id.* at 6:25–26.

by dew, dissolution occurs so that additional copper is taken up. *The buffering capacity of the formulation maintains the pH at a foliage-acceptable pH when the insoluble copper is rewetted so that conditions are optimal for uptake and are benign to the plant tissues.*

*Id.* 5:17–26. Plaintiff's argument that Example 9 illustrates how phosphorous-containing acids and salts alone may provide the patent's buffering capabilities is unsupported. Although the formulations prepared with copper are less suited for optimal solubility, the addition of copper to the phosphorous-containing acid provides the buffering capabilities described by the patent. The precipitated copper maintains the formulation's pH at a foliage acceptable level when it is rewetted by the dew overnight. *See id.*

Furthermore, Example 9 does not provide an understanding of how the phosphorus-containing acid and salts provide the copper-phosphorous formulation with buffering capabilities, consistent with the remaining patent claims and patent history. Plaintiff's asserted "buffered composition" of the phosphorus-containing acid and salts cannot be added to the same phosphorus-containing acid and salts to better maintain the pH for foliar application, increase solubility by combating precipitation of the phosphite salts, or allow higher concentrations of phosphite to be delivered to the plant. Rather, it is the suitable organic acids and salts, or mixed formulations of copper, that provide the novel buffering features described throughout the '665 patent, its parent patent and grandparent patent.

 The meaning of a patent's claims should not generally be derived solely from the use of illustrative examples. "It is the claims that define the claimed invention." *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1571 (Fed.Cir. 1988); citing *Uniroyal, Inc. v. Rudkin-Wiley Corp.,* 837 F.2d 1044, 1053 (Fed.Cir. 1988). Although the specifications may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims. *See id.; Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir. 1985); *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 (Fed.Cir.1985) (en banc); *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 (Fed.Cir.1985). A reading of Example 9 provides no evidence to indicate that the phosphorous-containing acid and salts alone may provide the described buffering capabilities described in the patent claims. Plaintiff's contention that copper does not act as a buffering agent when combined with the fertilizing phosphorus agent is open to question.

*Plaintiff's Reply: Buffering Is Not the Novel Aspect*

Plaintiff argues that the novel aspect of the '665 patent is that it is (1) fully solubilized and without precipitates, and (2) highly concentrated (greater than 30%). *See* Biagro Reply, 13:1–16. Plaintiff asserts these two features, not buffering, distinguishes the claims of the '665 patent from the prior art. *See id.* Plaintiff's contention is contrary to the patent language. It is the buffering agent that accomplishes both of these two novel features.

Increased solubility is a result of the addition of the buffering agent, organic acids and salts. "Suitable organic acids are those that maintain the phosphite ion in a substantially fully solubilized form upon dilution with water". *See id.* at 4:8–10. The combination of phosphites with a multiple buffering system of organic acids and their salts combats the tendency of the phosphorous to form precipitates, increased solubility is the

result.[10] Suitable organic acids which provide the enhanced formulations counteract the "tendency for phosphite to precipitate if diluted with alkaline water". *See id.* at 4:19–22. Emphasis is also placed on solubility improvements through the inventive buffered formulations, as opposed to simple phosphite salts. *See id.* at 4:58–62. It is not the phosphorus-acid based salts that allow the formulation to be fully solubilized without precipitates, but the buffering organic-acid based salts. Plaintiff's claimed distinguishing feature of increased solubility appears based on the novel buffering system of organic acids and their salts.

The higher concentrations of phosphorus delivered to the plant is also due to the increased solubility provided by the buffering agents. "The increased solubility of these formulation over that of phosphate of phosphite fertilizers makes it possible to prepare fertilizers with a greater concentration of phosphorus per unit volume that traditional phosphate or polyphosphate fertilizers." *Id.* at 4:58–62. Plaintiff's asserted distinguishing features of the '665 patent are both due to the addition of the organic acid and salts to the phosphorous-containing acid and salts.

#### c. *Extrinsic Evidence*

The intrinsic evidence of the '665 patent is sufficient to understand the disputed claim terms. A separate buffering agent is required to be added to the phosphorus-containing acid and salts to provide the patent invention with its novel qualities. Extrinsic evidence is not required to further clarify Plaintiff's patent claims. If intrinsic evidence alone is sufficient to resolve any ambiguities in disputed claim terms, extrinsic evidence should not even be considered. *See Phillips Petroleum*, 157 F.3d at 877.

Both parties urge considerable deference to an earlier case heard before Judge Coyle, granting a preliminary injunction to Plaintiff against Grow More, Inc.. *See* Helena Opp., 16:15–17:2, Ex. 17; Biagro Reply 14:9–24. That case involved determining whether a similar patent's claims also required a separate buffering agent. Defendant argues that Judge Coyle's rulings found that a separate buffering agent is required. *See* Helena Opp, 16:15–16. Plaintiff argues instead that Judge Coyle only concluded that there was no limitation on the means to provide the buffering effect. *See* Biagro Reply 14:14–17. The case before Judge Coyle involves a different set of different facts, parties, and patent claims. That order has also been appealed by Grow More Inc.. The analysis is instructive, but not dispositive.

Both parties offer varying definitions of what a "buffered composition" may be considered from a variety of extrinsic sources. Mr. Grech's declaration defines a buffered composition as a solution that resists changes in pH, based on *Chemistry of the Elements*, 2nd edition, p. 521. Mr. Grech also offers the definition of a "solution that resists change in pH when an acid or alkali is added or when the solution is diluted." *See* Supp Grech Dec. ¶10, Ex. B ("Oxford Dictionary of Chemistry"). Defendant presents alternative definitions of a buffer solution drawing from Chamber's Technical Dictionary, MacMillan Company, 1959, p. 118 (Ex. 35) ("buffer solution" is: "A solution of certain salts, usually of a weak-

---

**10.** "The fertilizer comprises a double or multiple buffer system of organic acids and their salts with a phosphorous-containing acids and their salts. The formulation stabilizes the phosphorous against oxidation to phosphate." *Id.* at 3:49–51.; "Substantially fully solubi- lized" means that upon dilution, "the phosphite does not precipitate, or at least not appreciably, so as to affect administration of the liquid product to the plant foliage, and thus is in a form available to the plant." *Id.* at 4:15–19.

ly ionized acid or base, whose acidity is not appreciably changed by addition of acid or alkali.") and Hackh's Chemical Dictionary, Third Edition, McGraw–Hill, at p. 146 (Ex. 36) ("buffer solution" is "Any solution of a weak acid or base and its salts, such as acetates, borates, phosphates, [and] phthalates, which behave as buffers".) Plaintiff replies that none of the definitions presented are inconsistent with allowing the phosphorus-containing acid based salt itself to provide the buffering. *See* Biagro Reply 12:19–26. Plaintiff also asserts that the testing by Mr. Grech and Mr. Peterson conclusively establish that Defendant's products are buffered compositions within the meaning of the '665 patent.

Resort to extrinsic evidence to define the function of a buffered solution or composition in the invention does not materially assist the inquiry. The patent language, parent patent and grandparent patent, provides the necessary guidance to determine the nature and function of the buffered solution described by the patent.

### C. *Literal Infringement*

■■■ A product literally infringes a patent claim only if every limitation of the claim is present in the device. *See Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 532 (Fed.Cir.1996). "[A]ny deviation from the claim precludes a finding of literal infringement." *Litton Systems Inc. v. Honeywell Inc.*, 140 F.3d 1449, 1454 (Fed. Cir.1998). It is well-established that if any element in a properly construed claim is missing in the accused device, there can be no literal infringement. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987) (en banc).

Each of the disputed claims specifies:

A concentrated phosphorus fertilizer comprising a buffered composition comprising a phosphorous-containing acid or salt thereof. . . .

Claim 1 differs slightly by stating that "at least one" phosphorous-containing acid or salt is present. The other claims differ only in calling out pH values and dilution ratios with water.

From the entirety of the patent language and prosecution history of all related patents, the claims in dispute require two ingredients: (1) a separate buffering agent, and (2) a fertilizing agent. The patent describes the buffering agent as comprised of an organic acid and salts thereof, or copper. The fertilizing agent is comprised of a phosphorous-containing acid and salts thereof.

■■■ Defendant's products do not contain a separate buffering agent. Defendants products both contain phosphorous acid, potassium hydroxide, and water. The Ele–Max 4–30–20 also contains urea which Mr. Grech opines is not a buffering agent. When the phosphorous acid and potassium hydroxide and water are combined in Defendant's products, various phosphite salts are also created. Plaintiff identifies no organic acid, organic salts, or other chemicals that act as buffering agents in Defendant's simple phosphite solution mix. Defendant's products do not contain a separate buffering agent on the present record, it does not appear there is any literal infringement of the '665 patent.

### D. *Contributory Infringement*

■■■ Contributory infringement is actionable under patent law. *See* 35 U.S.C. § 271(c). Proof of contributory infringement requires the following: (1) a direct infringement, (2) knowledge by the contributory infringer that its composition was used in the infringement of a patent, and (3) the composition must not be "a staple article or commodity of commerce suitable for substantial non-infringing use." *Id.; Preemption Devices v. Minne-*

sota Mining & Mfg. Co., 803 F.2d 1170, 1174 (Fed.Cir.1986).

A finding of contributory infringement first requires a finding of direct infringement. Plaintiff has not presented facts showing a reasonable likelihood of direct infringement by Defendant or another third party. Plaintiff is unable to show contributory infringement.

### E. Doctrine of Equivalents

■ Notwithstanding a finding of non-literal infringement, an accused product may infringe a patent if its difference from the patent's claims is insubstantial from the perspective of one of ordinary skill in the relevant art. See London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1538 (Fed.Cir.1991). The doctrine of equivalents prevents competitors from pirating the essence of an invention while narrowly avoiding the literal language of the claims. See EMI Group N. Am., Inc. v. Intel Corp., 157 F.3d 887, 896 (Fed.Cir.1998) (doctrine is designed "to prevent a fraud on the patent, when an accused infringer is 'stealing the benefit of the invention' by making insubstantial changes that avoid the literal scope of the claims."); Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 856–57 (Fed.Cir.1988). However, "the doctrine of equivalents is not a license to ignore or erase structural and functional limitations of the claim, limitations on which the public is entitled to rely in avoiding infringement." Athletic Alternatives, Inc. v. Prince Manuf. Inc., 73 F.3d 1573, 1582 (Fed.Cir.1996).

■ In determining whether a product infringes under the doctrine of equivalents, courts apply an "element-by-element analytical framework for infringement." Litton Systems, 140 F.3d at 1454. Under this framework, "the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." Id. (quoting Warner–Jenkinson, 117 S.Ct. at 1049). The Supreme Court cautioned against allowing a range of equivalents with "such broad play as to effectively eliminate that element in its entirety." Id. (quoting Warner–Jenkinson at 1054).

■ The United States Supreme Court announced the function-way-result test for infringement under the doctrine of equivalents in Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). To prove infringement under the doctrine of equivalents, the patentee must show that the accused device performs substantially the same function, in substantially the same way, to produce substantially the same result as the claimed invention. See Graver Tank, 339 U.S. at 608, 70 S.Ct. 854; see also Dawn Equip. Co. v. Ky. Farms Inc., 140 F.3d 1009, 1016 (Fed.Cir.1998). The functional equivalent of every limitation must be found in the accused device or there is no infringement. See Pennwalt Corp. v. Durand–Wayland, Inc., 833 F.2d 931, 937 (Fed.Cir.1987).

■ Prosecution history estoppel provides a legal limitation on the application of the doctrine of equivalents by excluding from the range of equivalents subject matter surrendered during the prosecution of the application for the patent. See Sextant Avionique v. Analog Devices, Inc., 172 F.3d 817, 826 (Fed.Cir. 1999). The estoppel may arise from matter surrendered as a result of amendments to overcome patentability rejections, or as a result of argument to secure allowance of a claim. See id. Speculation as to why a change in the claim was made is improper. See Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 234 F.3d 558, 566–567 (Fed.Cir. 2000). Furthermore, when no explanation for a claim amendment is established, no range of equivalents is available for the

claim element so amended. *See Festo Corporation,* 234 F.3d at 578.

▪ Plaintiff asserts that the phosphorus-containing acid and salts in Defendant's products may be considered functional equivalents of the '665 patent's described buffering system. *See* Biagro Reply 12:19–26. Plaintiff's position is untenable. Plaintiff's interpretation would be so broad as to subsume any chemical agents capable of producing phosphites that are taken up by plants, a craft long described in the prior art.

The patent language and prosecution history of the '665 patent, it's parent patent, and grandparent, all require that the buffering system consist of an organic acid and salts, or copper. The buffering agent is separate from the phosphite fertilizing agent. The organic acid and salts were to maintain and buffer the pH of the phosphorus-based fertilizer, to allow the solution to be substantially fully solubilized and to allow higher concentrations of phosphite to be delivered to the plant. These features were considered the novel and inventive aspects of the '665 patent. Their deletion by corrections does not prevent the use of earlier patents' language as admissions.

Plaintiff may not now claim that the phosphorus-based acid and salts in Defendant's products are functionally equivalent to its '665 novel patent properties. Defendant's phosphorus-based acids and salts do not maintain and buffer the pH of the phosphorus-based fertilizer. Defendant's phosphorus-based acid and salts do not reduce the precipitation of the phosphite salts thus allowing greater solubility and increased concentrations of phosphites to be taken up by the plants. Defendant's simple phosphorus-based acid and salts is not equivalent to the described purpose and function of the '665 patent buffering system. Defendant's products do not contain a separate buffered composition equiv-

alent as specified in the '665 patent. Plaintiff's present showing does not establish infringement under the doctrine of equivalents.

### F. *Patent Invalidity*

▪ Invalidity is a defense recognized by the Patent Act. *See* 35 U.S.C. § 282 (Presumption of validity; defenses). "A patent shall be presumed valid." *Id.* In addition, each claim of a patent shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. *See id.* The burden of establishing invalidity of a patent or any claim shall rest with the party asserting such invalidity. *See id.; SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 859 F.2d 878 (Fed. Cir.1988). The burden of the challenging party is "most formidable" when the party asserting invalidity relies upon prior art that was considered by the Patent and Trademark Office. *See Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573 (Fed.Cir.1983). Deference is due to a qualified government agency presumed to have properly done its job. *See Kloster Speedsteel AB v. Crucible Inc.,* 793 F.2d 1565 (Fed.Cir.1986); *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555 (Fed.Cir.1992). In addition, patent re-examinations are conducted afresh, without the burdens and presumptions that accompany litigation on an issued patent. *See Laitram Corp. v. NEC Corp.,* 952 F.2d 1357 (Fed.Cir.1992).

▪ However, the presumption of validity entitled to a valid patent may be rebuffed upon an adequate showing of obviousness or anticipation by the prior art. *See* 35 U.S.C. § 282. Obviousness is measured by one skilled in the art to which the subject matter pertains. *See* 35 U.S.C. § 103(a). Specific teachings, as well as

what the prior art suggests to one skilled in the art may be considered in determining whether a patent is invalid for obviousness. *See Application of Lamberti,* 545 F.2d 747, 750 (Fed.Cir.1976). Obviousness does not require absolute predictability. *Id.*

Defendant asserts that under Plaintiff's interpretation of claims, the Frazier article would invalidate the '665 patent for obviousness or reading on the prior art. *See* Helena Opp., 9:6–10:6. The Frazier article was published in *Fertilizer Research,* Vol. 32 (1992) by A.W. Frazier and K.R. Waerstad. *See id.,* Ex. 19. In his article, Frazier discusses how ammonium and potassium phosphites and hypophosphites have largely been ignored as possible fertilizers, despite their high contents of nutrient elements and high water solubilities. *See id.* Frazier attributed this lack of interest to inadequate characterization of the alkali and orthophosphites and to a widespread belief that the salts of the lower oxides of phosphorus were toxic to growing plants. *See id.*

After testing eight ammonium and potassium orthophosphites and hypophosphites, Frazier determined that phosphites could provide more highly concentrated fertilizers than phosphates. *See id.* at 168 ("Likewise, the utilization of phosphite and hypophosphite in liquid fertilizers may enhance the solubilization of the troublesome metallic impurities that are present in wet process phosphoric acid."). No buffering agents, organic acids and salts, or copper had been added to Frazier's analyzed samples. The pH values of Frazier's tested samples appear to fall within the range of both parties' products. *See id.* at 167.

Plaintiff contends that the Frazier article may be distinguished based on its primary focus on the solid forms of phosphite salts and that foliage application is not discussed, only soil application. Furthermore, the '665 patent does not limit itself to solid state forms of phosphite salts. The '665 patent states in its "Methods of Preparation":

> The fertilizer compositions can also be prepared as solid formulations, identical to the liquid ones by simply leaving out all of the water. The properties are the [s]ame as the liquid formulations but have the additional advantage of weighing less for the same amount of nutrient.

*See* Helena Opp., Ex. 2, 6:38–42. Although Frazier does not discuss the foliar-applicability of phosphite fertilizers to plants, foliar application appears to be an obvious or anticipated goal to one skilled in the art of fertilizer research and effective application. Determining foliar acceptable pH levels in conjunction with agricultural water pH levels and possible dilution ratios also appear to be an obvious or anticipated goal of one skilled in the art. Frazier's article explicitly discusses how phosphites are an overlooked source of possible fertilizers.

Defendant has also prepared a fertilizer concentrate as described in Frazier for testing of buffering capabilities. *See id.,* 24:16–25; Volgas Dec. and Hayes Dec. When the solution was diluted at 1:40 and 1:600 with water of pHs of 6.5 and 8.5, the resulting pH was within the foliage acceptable range of 5.0 to 7.0. *See* Blum Dec., Test 1; Young Dec., ¶ 17. In addition, when the solutions were titrated with sodium hydroxide, the pH change was nonuniform. *See* Young Dec., ¶ 17; Blum Dec., Test 2. This nonuniform change in pH would meet Mr. Grech's definition of a buffered solution. Plaintiff does not dispute this assessment.

Plaintiff does assert, however, that Defendant inadequately prepared the Frazier formulation by filtering out the precipitates present in the solution. *See* Biagro Reply, 7:6–10. In a Response Declaration of Mr. Volgas, Defendant asserts that the

solution was filtered because the commercial starting material, phosphorous acid, contained some insoluble materials. *See* Response Volgas Dec., ¶ 3. Mr. Volgas asserts that the filtration of the solution did not affect his testing and analysis. *See id.* At oral argument, Plaintiff argued that Mr. Volgas improperly transferred the phosphorous acid into the water. Despite this difference in mixing technique, the Frazier article and its described solution raise a substantial question as to the validity of the '665 patent if Plaintiff's interpretation of no separate buffering agent is required by the patent claims is accepted. Defendant has raised a substantial question as to the validity of the '665 patent.

In Plaintiff's Supplemental Memorandum submitted after oral argument, Plaintiff asserts that a patent's claims must be considered in light of the invention's overall objectives in distinguishing the invention from the prior art, and that the distinguishing feature of the '665 patent is that it is "a clear liquid devoid of precipitate", even though it is not a claim limitation. *See* "Supplemental Memorandum of Points and Authorities", April 20, 2001, 4:1–4. Plaintiff's cite to *U.S. v. Adams* states: "While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly, it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." 383 U.S. at 48–49, 86 S.Ct. 708.

The '665 patent does not distinguish itself from the prior art because it is "a clear liquid devoid of precipitate". While this characteristic is one of the many features described, it is the unique formulation of the buffering system agents combined with the fertilizing agent that appear to readily distinguish the '665 patent from the prior art. As discussed earlier, the lack of precipitates appears to be a function of the buffering organic acids that allow substantially full solubility and combat the tendency of the phosphorous to form precipitates.

### G. *Irreparable Harm*

Irreparable harm may be presumed when a clear showing of patent validity and infringement has been made. *See Amazon,* 239 F.3d at 1350. Plaintiff has not shown that Defendant has infringed the '665 patent; no presumption of irreparable harm arises.

Plaintiff asserts that Defendant's products compete directly with Plaintiff's products and that Defendant's products have, and will, negatively impact Plaintiff's product sales. *See* Supp. Alvitre Dec. at ¶ 7. Plaintiff contends that the loss of the Florida contract in 2000–2001 season was a direct result of Defendant's alleged infringement of Plaintiff's license on the '665 patent. *See id.* Plaintiff asserts that this is a contract that Plaintiff has been awarded every year since the 1994–95 season. Plaintiff asserts that unless stopped, Defendant's products will continue to negatively impact and dramatically harm Plaintiff's only business. *See id.*

■ The fact that the parties may compete directly with one another does not per se constitute irreparable harm. Monetary damages by itself, from lost sales, are not typically considered irreparable harm. While protection of the rights of patent holders and the public may be considered as irreparable harm, the presumption arises only when a clear showing of patent validity and infringement has been made. *See Amazon,* 239 F.3d at 1350. Here, there is a credible dispute over the strength and validity of the patent.

## H. *Balance of Hardships*

Plaintiff asserts that its only business is the manufacturing and selling of agricultural fertilizer products derived from phosphorous acid. *See* Supp. Alvitre Dec. at ¶ 3. Plaintiff asserts it is a significantly smaller corporation than Defendant, a multi-national fertilizer company that offers a variety of crop production products, agricultural chemicals seed fertilizers and related products. *See* Alvitre Dec. at ¶ 21.

 Plaintiff has not made a showing of the requisite harm to justify a preliminary injunction. Loss of market share by itself is not the irreparable harm a preliminary injunction was meant to enjoin. Plaintiff has several other products to market which employ technologies not based on the '665 patent. Plaintiff has experienced significant commercial success with its products the eights years it has been in existence. *See* Supp. Alvitre Dec. at ¶ 5. Plaintiff's sales volume of phosphite fertilizer products has grown every year since 1993 and continues to grow, despite competition from others, as the history of its prior patent infringement cases shows. *See id.* Every year since 1993, Plaintiff has sold more gallons of phosphite fertilizers than it did the prior year. *See id.* Plaintiff's size does not tip the balance of hardships in Plaintiff's favor.

## I. *Public Interest*

The focus of the public interest analysis is often said to be whether there is some critical public interest that would be injured by the grant or denial of the preliminary injunction. *See Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed.Cir.1988). Jeopardizing the public health is one such a legitimate factor for the denial of a preliminary injunction. *See Datascope Corp. v. Kontron Inc.*, 786 F.2d 398 (Fed.Cir.1986).

Here, the public interest is not served by enjoining parties when the patent in suit is of questionable efficacy. Plaintiff makes no other showing any critical public interest is implicated.

## V. *CONCLUSION*

Plaintiff, BIAGRO WESTERN SALES, INC., has not shown a reasonable likelihood of patent infringement by Defendant, HELENA CHEMICAL COMPANY. Plaintiff has not shown that irreparable harm may occur if its application for a preliminary injunction is denied. The balance of hardships does not favor Plaintiff. The public interest is not served by granting Plaintiff injunctive relief. Plaintiff's application for a preliminary injunction is DENIED.

Defendant's evidentiary objections are moot.

SO ORDERED.